# EXHIBIT C

Page 1

1          IN THE UNITED STATES DISTRICT COURT
2          FOR THE NORTHERN DISTRICT OF ALABAMA
                   SOUTHERN DIVISION
3    CURTIS J. COLLINS,        )
              Plaintiff   )
4                             )
                              )
5                             )
     VS.          ) Case No. 2:11-CV-0938-AKK
6                             )
                              )
7    EXPERIAN INFORMATION     )
     SOLUTIONS, INC.,         )
8          Defendant   )
9    *******************************************************
10         ORAL DEPOSITION OF
11    EXPERIAN INFORMATION SOLUTIONS, INC.
12    BY AND THROUGH ITS DESIGNATED REPRESENTATIVE
13              TERESA IWANSKI
14              JUNE 21, 2012
15    *******************************************************
16    ORAL DEPOSITION OF TERESA IWANSKI, produced as a
17   witness at the instance of the Plaintiff, and duly
18   sworn, was taken in the above-styled and numbered cause
19   on June 21, 2012, from 9:26 a.m. to 2:01 p.m., before
20   Christi Sanford, CSR, RPR, CRR, Texas Certification
21   No. 6720, in and for the State of Texas, reported by
22   machine shorthand, at the offices of Jones Day, 2727
23   North Harwood Street, Dallas, Texas, pursuant to the
24   Federal Rules of Civil Procedure and the provisions
25   stated on the record.

Page 2

1
2              APPEARANCES
3
     For the Plaintiff:
4         Mr. David L. Selby, II
          Bailey & Glasser, LLP
          One Chase Corporate Center, Suite 400
5         Birmingham, Alabama 35244
          (205) 313-6490
6         (205) 313-6491 Fax
          dselby@baileyglasser.com
7
          Mr. Wesley L. Phillips
8         Phillips Law Group, LLC
          P.O. Box 130488
9         Birmingham, Alabama 35213
          (205) 383-3585
10        (800) 536-0385 Fax
          wlp@wphillips.com
11
     For the Defendant:
12
          Mr. Gregory R. Hanthorn
13        Jones Day
          1420 Peachtree Street, N.E., Suite 800
14        Atlanta, Georgia 30309-3053
          (404) 581-3939
15        (404) 581-8330 Fax
          ghanthorn@jonesday.com
16
          Mr. Sean H. McCarthy
17        Jones Day
          717 Texas, Suite 3300
18        Houston, Texas 77002-2712
          (832) 239-3939
19        (832) 239-3600 Fax
          smccarthy@jonesday.com
20
21
22
23
24
25

Page 3

1              INDEX
                         PAGE
2
     Appearances                        2
3
     WITNESS: TERESA IWANSKI
4
5         Examination by Mr. Selby         4
          Examination by Mr. Hanthorn      156
          Re-examination by Mr. Selby      157
6
7
8              EXHIBITS
9
     NUMBER    DESCRIPTION            PAGE
10
     1 Equable Ascent Financial v. Collins
11     Curtis, III, Judgment By Trial       25
     2 Correspondence to Experian from Curtis
12     Collins                        26
     3 Correspondence from Experian to Curtis
13     Collins dated 8/9/10              30
     4 Correspondence to Experian from Curtis
14     Collins, Copy of driver's license and
       Social Security card             79
15   5 D/R Log Report, 3/17/11, EXP 000509    81
     6 Experian Report number 2252-3310-67,
16     9/9/10                         93
     7 Experian ACDV Report, 7/8/11, EXP002258 129
17   8 Credit Report Printout, 11/15/10     129
     9 Experian Report number 2552-3310-67,
18     11/23/10, EXP 00037              131
     10 Experian ACDV Report, 2/28/11,
19     EXP 002257                     132
     11 Experian Report number 3377-7674-78,
20     2/28/11, EXP 00059             140
     12 Experian Report number 3377-7674-78,
21     3/10/11, EXP 00071             141
22
23
24
25

Page 4

1              TERESA IWANSKI,
2    having been first duly sworn, testified as follows:
3              EXAMINATION
4    BY MR. SELBY:
5         Q.  Teresa, is that right?
6         A.  Yes.
7         Q.  Okay.  David Selby.  We met earlier.  I
8    represent Curtis Collins in this matter against Experian
9    and I'm here today for your deposition.
10             Let me ask you this:  What position do you
11   hold --
12             MR. HANTHORN:  Before we go into the --
13   David, to clarify, we're here today for the 30(b)(6)
14   deposition of Experian.
15             MR. SELBY:  Right.
16             MR. HANTHORN:  And Ms. Iwanski is the
17   witness who has been designated to discuss those topics
18   that we sent in the letter we sent to Wesley, and
19   perhaps you, earlier this week.  Just so that when you
20   and I read this later we're clear, in general terms,
21   Ms. Iwanski is the person who looked at for, the
22   30(b)(6) deposition, the Curtis Collins reinvestigation.
23             And I apologize for interrupting.
24             MR. SELBY:  That's fine.
25        Q.  (BY MR. SELBY)  What is your position with

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 5

1  Experian?
2      A.  I'm the senior legal and compliance specialist.
3      Q.  And how long have you held that position?
4      A.  Since the end of 2006.
5      Q.  And what are your job -- what would be your job
6  description for that position?
7      A.  Generally, it is handling consumer disputes
8  when consumers either hire an attorney or they have
9  questions about their report.  I also assist internal
10 and outside counsel when Experian is named in a consumer
11 lawsuit.
12     Q.  Okay.  Would it be fair to say, I guess,
13 generally you don't get involved unless a lawsuit's
14 filed or a lawyer is involved?
15     A.  Not all the time.
16     Q.  Okay.  Are there instances where you would get
17 involved when a lawyer or a lawsuit has not been filed?
18     A.  Yes.
19     Q.  Okay.  What would be an example of that?
20     A.  Part of my background with Experian, I do
21 assist on any kind of training or any kind of questions
22 that an agent would have.
23     Q.  Okay.  You said training?
24     A.  Uh-huh.  Yes, sir.
25     Q.  Okay.  And questions an agent may have?

Page 6

1      A.  Yes, sir.
2      Q.  Okay.  An agent being who?
3      A.  When I say agents, I mean the people that are
4  trained in order to handle mail and telephone calls by
5  consumers.
6      Q.  Okay.  And do you hold that position for a
7  certain region or are you over that for all of Experian?
8      A.  That's just part of my job duties.
9      Q.  Okay.
10     A.  It's not for a region.
11     Q.  And as senior legal and compliance specialist,
12 who do you report to?
13     A.  Carolyn Helm.
14     Q.  Carolyn Helm?
15     A.  Yes, sir.
16     Q.  And what is her title?
17     A.  Compliance manager.
18     Q.  And are you and Carolyn -- is y'all's
19 department under the legal umbrella department?
20     A.  I don't know.  I don't believe -- my
21 understanding, it's compliance.
22     Q.  Okay.  And you don't know whether compliance
23 falls under legal at Experian?
24     A.  If there's an umbrella, I just don't have
25 knowledge of that.

Page 7

1      Q.  Prior to 2006, what was your position with
2  Experian?
3      A.  I was an auditor, a quality auditor for
4  Experian.
5      Q.  Okay.  And how long were you quality auditor?
6      A.  I think, for about a year, maybe a little bit
7  more.  Maybe a year and a half.  I'm not quite sure
8  exactly the time frame.
9      Q.  2004, 2005, something like that?
10     A.  Roughly.
11     Q.  Okay.  And prior to the auditor position, what
12 position did you hold at Experian?
13     A.  I was a dispute agent.
14     Q.  And how long were you a dispute agent?
15     A.  It would be starting in September 2003.
16     Q.  Is that when you started at Experian?
17     A.  Yes, sir.
18     Q.  Prior to Experian, where did you work?
19     A.  I worked for Verizon Wireless.
20     Q.  Okay.  What did you do with Verizon Wireless?
21     A.  I was in sales.
22     Q.  Just retail sales at a retail store?
23     A.  No.  It was more of an inbound call center-type
24 thing.
25     Q.  Taking inbound calls from present Verizon

Page 8

1  customers?
2      A.  Potential customers, yeah.
3      Q.  Okay.  Did you ever work in any kind of
4  compliance or auditing-type position at Verizon?
5      A.  No.
6      Q.  Okay.  Strictly at Verizon was in sales?
7      A.  Yes, sir.
8      Q.  Okay.  And how long were you at Verizon?
9      A.  I believe, a couple of years.  I'm not quite
10 sure of the exact time frame.
11     Q.  And then prior to Verizon, where were you?
12     A.  I believe -- it would be Track 'n Trail, I
13 believe.  It was just a long time ago.  I can't remember
14 exactly the time frame.
15     Q.  What did you say?
16     A.  Track 'n Trail.
17     Q.  Okay.  What is that?
18     A.  It is a shoe company.
19     Q.  Okay.  And were you in sales for them?
20     A.  No.  I was in accounting.
21     Q.  Okay.  And how long were you there at
22 Track 'n Trail?
23     A.  I don't know.  Maybe a year.
24     Q.  Okay.  When did you graduate college?
25     A.  I did not graduate.

2  (Pages 5 to 8)

Page 9

1    Q.  Okay.
2    A.  I'm still pursuing.
3    Q.  Okay.  What are you -- what degree are you
4  pursuing?
5    A.  Just general.  I haven't gone to college -- I
6  haven't finished college.  So whenever I have an
7  opportunity to go, then I go.
8    Q.  Prior to Experian, had you ever worked
9  at any kind of job where you had the duties which you're
10  doing now, dealing with legal or compliance?
11    A.  No.
12    Q.  And prior to taking the position in 2006 with
13  Experian, the senior legal and compliance specialist
14  position, was -- any training that you received, was
15  that all internal through Experian?
16    A.  Yes, sir.
17    Q.  Okay.  Did you receive any type of training
18  outside of the confines of Experian for that position?
19    A.  No, sir.
20    Q.  Okay.  Was there actually a training period
21  time before you took the position as senior legal and
22  compliance specialist or was that something that you
23  took that position and then trained as you went?
24    A.  As far as the position, everything that I had
25  learned through Experian, through my job

Page 10

1  responsibilities led me -- was able to do my current
2  position.  There was no training for this position.
3    Q.  Okay.  How many people at Experian hold the
4  same position, the same title?
5    A.  Four.
6    Q.  Four?  Okay.  Who are those folks?
7    A.  Jason Scott, Mary Methvin.
8    Q.  Methvin?
9    A.  Yeah.  Methvin, v-i-n.
10    Q.  Yeah.
11    A.  Carla Blair.
12    Q.  And would Carla, Mary or Jason do the same
13  thing you're doing and it's just how -- well, how is it
14  divided over who does what among the four of you?
15    A.  As far as the federal cases, it would be Jason
16  and myself.  Small claims would be Mary and Carla.
17    Q.  Okay.  So if it's a case pending in federal
18  court, you or Jason handle it; is that correct?
19    A.  When you say "handle it," it's going to be
20  either Jason or myself doing depositions.  We all do the
21  same kind of job functions, though.
22    Q.  Okay.  Is part of your job as senior legal and
23  compliance specialist to give depositions on behalf of
24  Experian?
25    A.  Yes, it is.

Page 11

1    Q.  Not counting today, how many times have you
2  given your deposition --
3    A.  I don't keep --
4    Q.  -- for Experian?
5    A.  I don't keep track.
6    Q.  How many have you done this year?
7    A.  I don't have a number.  I don't keep track of
8  it.  I've been doing these since 2006.
9    Q.  Okay.  Would you say more than 100?
10    A.  I don't know.  I really don't know.
11    Q.  You don't have any idea?
12    A.  No, sir.
13    Q.  Okay.  Have you done any this year, other than
14  this one?
15    A.  Yes.
16    Q.  Okay.  Did you do one last week?
17    A.  No.
18    Q.  Okay.  Have you done any this month?
19    A.  No.
20    Q.  Okay.  Have you done any this year, other than
21  this one?
22    A.  Yes.
23    Q.  Okay.  And you don't know how many that is?
24    A.  No, sir.
25    Q.  Okay.  Within Experian, is there any way -- if

Page 12

1  somebody wanted to know that, how would they find that
2  out?
3    A.  I really don't know.  I don't know if or who
4  would keep track of that information.  I have no idea.
5    Q.  Have you been asked a lot of times in your
6  deposition how many times you've given your deposition?
7    A.  Yes, I have.
8    Q.  Okay.  And is that answer the same, what you
9  just gave me, "I don't remember"?
10    A.  I don't remember.  I don't keep count, sir.
11         MR. HANTHORN:  Other than perhaps the
12  first one, right, Dave?
13    Q.  (BY MR. SELBY)  Have you had to testify in
14  trial?
15    A.  Not in a federal trial with juries and such,
16  no.
17    Q.  Okay.  Have you testified in any arbitrations,
18  arbitration hearings?
19    A.  I don't believe so.  I've attended small
20  claims, if you want to call that trial.  I just don't --
21  I'm not an attorney.  But I have attended small
22  claims --
23    Q.  Okay.
24    A.  -- and testified for Experian.
25    Q.  Other than small claims, have you ever

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 13

1    testified in any type of judicial proceeding?  And I'm
2    not counting a deposition.
3        A.   Whatever would be testified in writing, any
4    kind of -- any -- outside of depositions and what I
5    would normally do, no.
6        Q.   Okay.  And you've been giving depositions, you
7    said, since 2006?
8        A.   Uh-huh.
9        Q.   Had you given any depositions prior to 2006 --
10       A.   Nuh-uh.
11       Q.   -- prior to becoming --
12       A.   No, sir.
13       Q.   Okay.  So you didn't start doing depositions
14   until you took the title of senior legal and compliance
15   specialist?
16       A.   That's correct.
17       Q.   All right.  And you never gave a -- when you
18   were a dispute agent, if there was a case dealing with a
19   dispute you handled, you didn't give a deposition with
20   regards to that, did you?
21       A.   No.  I never have done a deposition prior.
22       Q.   Okay.  Experian would designate somebody at
23   that time in senior legal and compliance to give that
24   deposition?
25       A.   If the title was different, the same position,

Page 14

1    yes, sir.
2        Q.   Okay.  And are you aware of any instances where
3    the dispute agent is actually -- that deposition has
4    actually been taken by an attorney, any cases that
5    you've monitored as senior legal and compliance?
6        A.   Yes, I have.
7        Q.   Okay.  And have you ever given a deposition in
8    the state of Alabama?
9        A.   No, I have not.
10       Q.   Okay.  Have you ever given any depositions
11   outside of the State of Texas?
12       A.   Yes.
13       Q.   Where have been some other states you've given
14   depositions?
15       A.   I believe the only other state was New York.
16       Q.   Okay.  So other than New York, would it be fair
17   to say that all other depositions were here in Texas?
18       A.   Yes, sir.
19       Q.   Okay.  And were, for the most part, all those
20   depositions here at Jones Day?
21       A.   There have been a few that were not, but,
22   generally, yes.
23       Q.   Okay.  Other than testifying in depositions,
24   what would be your role as a compliance specialist?
25            MR. HANTHORN:  You mean other than what

Page 15

1    she's already told you earlier or do you want her to
2    repeat that?
3        Q.   (BY MR. SELBY)  As a compliance specialist,
4    what do you do?
5        A.   Generally, I assist consumers when they call
6    in.  I also work with internal and outside counsel
7    whenever Experian's named in a federal lawsuit to gather
8    documents for discovery.
9        Q.   And when was the first time you became aware of
10   Curtis Collins' dispute?
11       A.   As far as the -- when Experian was named in the
12   lawsuit and Experian's counsel contacted me to gather
13   the documents.
14       Q.   Okay.  So prior to Experian's counsel -- and
15   when you say "Experian's counsel," are you talking about
16   somebody with Jones Day or are you talking about
17   somebody internally?
18       A.   It would be Jones Day handling the case.
19       Q.   Okay.  So it would be fair to say that the
20   first time you were aware of Curtis Collins' case was
21   when somebody from Jones Day contacted you about it?
22       A.   That's correct.
23       Q.   Okay.  You had never at any point before that
24   assisted or looked into Curtis Collins' complaint?
25       A.   No, sir.

Page 16

1        Q.   Okay.  And when you began investigating Curtis
2    Collins' complaint, tell me, what was the first thing
3    you did?
4            MR. HANTHORN:  I'm going to object to the
5    extent the question calls for work product to the extent
6    it had to do with anything that she was directed to do
7    by counsel in order to help and assist counsel in
8    preparing for the case.  If there was something she did
9    that was not at counsel's direction and that does not
10   invade the work product, she can answer.
11           Do you understand what I'm asking you not
12   to answer, Ms. Iwanski?
13           THE WITNESS:  Yes, sir.
14           MR. HANTHORN:  Okay.
15       Q.   (BY MR. SELBY)  Did you do anything to
16   investigate this on your own, other than what the
17   lawyers were telling you to do?
18       A.   Anything done was at direction of counsel.
19       Q.   Okay.  So on behalf of Experian, you've done
20   nothing to investigate Curtis Collins' matter, other
21   than what Jones Day have told you?
22       A.   Everything would be at direction of counsel.
23       Q.   Okay.  Nothing has been on your own?
24       A.   Everything done would be at direction of
25   counsel.

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 17

1    Q.  Okay.  And prior to you getting involved with
2  this matter, do you know who at Experian did look into
3  Curtis Collins' complaint?  What individuals?
4    A.  I don't know if there were any.
5    Q.  Okay.
6      MR. HANTHORN:  And you are talking about,
7  Dave, just to make sure I have the time frame in my
8  head, after the lawsuit was filed or are you including
9  anything involving Curtis Collins from the time the
10  dispute first began -- from the time he first contacted
11  Experian?
12      MR. SELBY:  From the time Experian first
13  learned of his dispute.
14    A.  Are we talking -- I'm sorry.  I apologize.  Are
15  we talking about the complaint itself or just overall
16  him contacting Experian?
17    Q.  (BY MR. SELBY)  From the very first time he
18  contacted Experian.
19    A.  And I apologize.  Can you ask the question
20  again?
21    Q.  Okay.  Who is it that, prior to you getting
22  involved, would have been the one overseeing and looking
23  into Curtis Collins' complaint?
24      MR. HANTHORN:  And when you say
25  "complaint," again, you mean dispute --

Page 18

1      MR. SELBY:  Dispute.
2      MR. HANTHORN:  -- as opposed to the
3  lawsuit?
4      MR. SELBY:  Yeah.
5      MR. HANTHORN:  I'm sorry, Dave.  I'm
6  trying to stay out of your way, but --
7    A.  If we are talking about the contacts that
8  Mr. Collins has had with Experian, it would be a dispute
9  agent that would handle the piece of mail, if we're
10  talking about a piece of mail.  And I believe the name
11  of the agent was already given in an interrogatory.  I
12  don't -- I didn't memorize the name.
13    Q.  (BY MR. SELBY)  Okay.  Have you talked to that
14  dispute agent?
15    A.  No, I have not.
16    Q.  Okay.  Have you talked with anybody at Experian
17  to get ready for the deposition today?
18    A.  Anything done would be at direction of counsel.
19  But as far as speaking to the agents, no.
20    Q.  Other than the agents, putting the agents
21  aside, have you spoken to anybody else at Experian to
22  get ready for the deposition?
23    A.  Anything discussed would be at direction of
24  counsel.  Beyond that, no.
25      MR. HANTHORN:  She talked to us.

Page 19

1      MR. SELBY:  Okay.  Okay.
2      MR. HANTHORN:  I mean, I'm perfectly happy
3  to point out --
4      MR. SELBY:  And she's made that clear.
5  I'm just trying to --
6    Q.  (BY MR. SELBY)  Have you talked to anybody else
7  at Experian to get ready for the deposition?
8    A.  No.
9    Q.  Since your involvement, then, the only things
10  that you've done have been at the direction of Jones
11  Day, correct?
12    A.  Yes, sir.
13    Q.  Okay.  No investigation on your own, correct?
14    A.  That's correct.
15    Q.  Okay.  And you haven't spoken with anybody
16  other than Jones Day lawyers about the case?
17    A.  To get ready for the deposition, yes.
18    Q.  Okay.  And have you spoken with anybody other
19  than Jones Day lawyers, other than getting ready for the
20  deposition, about Curtis Collins?
21      MR. HANTHORN:  I'm sorry.  Let me object
22  on the same work product grounds.  If it helps, I will
23  stipulate that there were some conversations that Jones
24  Day lawyers were involved with that had more than one
25  person from Experian on the line when we were doing some

Page 20

1  of our factual and work product investigation.  As to
2  those, I'm going to instruct the witness not to answer
3  on the grounds of work product.
4    Q.  (BY MR. SELBY)  Okay.  Other than conversations
5  where the lawyers were involved, have you had any
6  conversations on your own to investigate Curtis Collins'
7  complaint?
8    A.  No.
9    Q.  Okay.  Other than talking with other people at
10  Experian at direction of -- well, have you looked at any
11  documents on your own?
12    A.  Just reviewed the documents that Experian
13  produced in discovery to get ready for the deposition.
14    Q.  Okay.  That the lawyers produced?
15    A.  Yes, sir.
16    Q.  Okay.  And it would be fair to say that you, as
17  the senior legal and compliance person in that position
18  assigned to Curtis Collins' dispute, you haven't, on
19  your own said, Hey, I need to look into certain
20  documents?
21    A.  As far as the documents, I reviewed everything
22  that was produced.  Beyond that, it would just be
23  conversations with counsel.
24    Q.  Okay.  But when you say you've reviewed
25  everything that's been produced, you're talking about in

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 21

1  the lawsuit, correct?
2      A.  Yes, sir.
3      Q.  Okay.  And --
4          MR. HANTHORN:  As the witness testified,
5  she also helped find those documents in order to produce
6  them.
7      Q.  (BY MR. SELBY)  Okay.  What documents did you
8  find on your own, not at direction of counsel?
9      A.  There's no documents that were found.  It's
10 just the business records that we normally keep; and
11 those were produced.
12     Q.  Okay.  There wasn't a situation where, when you
13 got assigned this file by Experian, that you looked at
14 it and said, Hey, based on this dispute and based on my
15 knowledge of how things work at Experian, I'd like to
16 know A, B and C?
17         MR. HANTHORN:  And you're asking, to make
18 sure I understand, given the work product nature of what
19 happened, if she did that on her own as opposed to
20 having that conversation with me and then going ahead
21 and doing that in order to inform me; is that correct?
22         MR. SELBY:  I don't really know what
23 you're saying, Greg.
24         MR. HANTHORN:  Okay, David.  Maybe the
25 problem is I don't know what you're saying.  And I

Page 22

1  apologize if we're talking across each other.
2          Because the witness first got involved
3  with this working actively with counsel, asking the
4  witness what she did on her own, when everything she's
5  doing is helping inform me and Sean as to what's going
6  on, is asking her perhaps to separate something that
7  can't logically be separated.
8          So to the extent you have done anything,
9  as Dave has continued to use the phrase, "on your own,"
10 please feel free to do that.  But to the extent that you
11 were coming up with suggestions of places that we ought
12 to look or things we ought to do to assist me and Sean
13 in developing what's going on in work product, that's
14 protected by work product and I'm asking you to leave
15 that out.
16         Dave, that's what I'm trying to make sure
17 we're keeping separate.
18         MR. SELBY:  Yeah.  And I'll just -- I
19 mean, I'm not going to get into a back and forth on
20 this, but let me just state for the record, I completely
21 disagree with your definition of how you're broadening
22 work product, but I'm --
23         MR. HANTHORN:  We can fight that out
24 later.
25         MR. SELBY:  That can -- that's been

Page 23

1  decided numerous times on 30(b) issues like this.
2      Q.  (BY MR. SELBY)  But what I want to know is,
3  simply, when you got the Curtis Collins matter and you
4  understood what his complaint was, did you, on your own,
5  without the lawyers having to tell you what to do, as
6  the senior legal and compliance person, did you say,
7  Hey, you know, based on what he's complaining, I need to
8  look into this and get these particular documents?
9          MR. HANTHORN:  Same objection.  You may
10 answer subject to the objection.
11     A.  As far as the documents, it's the documents
12 that we normally keep in the course of business, and
13 that was no different than any other case.  As far as
14 reviewing anything, that would be at direction of
15 counsel or conversations with counsel.  Beyond that,
16 there was nothing else.
17         MR. SELBY:  And, Greg, I take it, based on
18 your repeated instructions to her, that Experian will
19 not be providing her as a trial witness because of what
20 she cannot testify to because of it being work product
21 and privileged?
22         MR. HANTHORN:  No, because she can
23 continue to testify as to what the documents are, how
24 they're kept in the normal course of business and many
25 things that have nothing to do with your questions.

Page 24

1          MR. SELBY:  No.  That's not what I'm
2  talking about.
3          MR. HANTHORN:  Okay.
4          MR. SELBY:  The questions I'm asking that
5  you're telling her she can't answer as to work product,
6  your position is not going to be that she can answer
7  those later?
8          MR. HANTHORN:  My position is going to be,
9  as to the items that are work product, that on this
10 30(b)(6) deposition, to the extent it was done at the
11 direction of counsel, was done at the direction of
12 counsel.  If later on there is testimony that she can
13 give that involves what she did not at the direction of
14 counsel or that involves things like explaining what
15 documents are, explaining how they're used, explaining
16 those types of things, then, yes, she can continue to do
17 that.  I don't know how else, really, to address your
18 point, David.
19     Q.  (BY MR. SELBY)  Other than explaining
20 documents, if the Court were to ask you on its own to,
21 say -- other than giving your opinion on what a document
22 means or what's kept in the normal course of business,
23 is there anything you could testify to that wasn't done
24 at the direction of counsel?
25         MR. HANTHORN:  Object to the form of the

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 25

1  question; hypothetical, speculative. You may answer.
2      A. Everything done was at direction of counsel.
3  Whether or not a court tells me, I'm not an attorney. I
4  really don't know how it works.
5      Q. (BY MR. SELBY) So everything was done at the
6  direction of counsel?
7      A. Yes, sir.
8          (Exhibit Number 1 was marked)
9      Q. Okay. I've put in front of you what's been
10 marked Plaintiff's Exhibit 1 -- or Deposition Exhibit 1,
11 which is the judgment by a trial that was entered in the
12 District Court of Jefferson County, Alabama, Birmingham
13 Division.
14         And the first question I'll ask you: Have
15 you ever seen this before?
16     A. Yes. Getting ready for the deposition, I did
17 review this document that we received post-litigation.
18     Q. Okay. And in your review of the file, once
19 you -- when you received it at the time of litigation,
20 was this document in Experian's file?
21     A. I'm sorry. I didn't quite understand the
22 question. I apologize.
23     Q. Was this document -- Deposition Exhibit 1, was
24 it in Experian's file at the time you were assigned the
25 file?

Page 26

1      A. No, sir. This was received post-litigation
2  through counsel. It was not in something that Experian
3  produced.
4      Q. Okay. And do you know how Experian obtained
5  Exhibit 1?
6      A. I just know through counsel. That's all I
7  know, sir.
8          MR. HANTHORN: If it helps, David, I'd be
9  happy to stipulate that Wesley provided it in response
10 to a document request.
11         MR. SELBY: And that stipulation, it goes
12 without saying that that was -- prior to getting it
13 through plaintiff's counsel, that was not in Experian's
14 file?
15         MR. HANTHORN: That's what I think the
16 witness has testified to, and I also believe it to be
17 true. I mean, I'm not --
18         (Exhibit Number 2 was marked)
19     Q. (BY MR. SELBY) I'll show you what is
20 Deposition Exhibit 2 and ask you if you recognize that
21 document?
22     A. I recognize the document. However, it's not
23 the entire document that Experian produced. It appears
24 to be a single page of a document that Experian
25 produced.

Page 27

1      Q. Okay. Identify what this document is.
2      A. It's a letter addressed to Experian --
3      Q. Okay.
4      A. -- according to the document that I'm looking
5  at right now.
6      Q. And who is it from?
7      A. According to the document, it shows a Curtis
8  Collins as the name of this -- the document itself.
9  Like I said, it just doesn't have the entire document
10 showing how this information was sent to Experian.
11     Q. Okay. And when you say it doesn't have the
12 entire document showing how it was sent to Experian,
13 explain what you mean by that.
14     A. Sure. What's left out is the envelope -- a
15 copy of the envelope, front and back. So that shows how
16 the information was sent to Experian. And this
17 particular document was sent in what appeared to be a
18 mass mailing, which showed to possibly not be actually
19 sent by Mr. Collins. So I just wanted to make sure that
20 was clear.
21     Q. Okay. And when you say "appeared to be a mass
22 mailing," explain what you mean by that.
23     A. Sure. Part of the process where Experian
24 receives mail, we also look at how the information is
25 sent to Experian. And there are times when there is

Page 28

1  a company purporting to be from the consumer. So we do
2  look to see if there is similar envelopes with writing,
3  with mailing, with P.O. Box, in a similar style of
4  letter as well to see if that looks suspicious when
5  they're purporting to be from the consumer.
6      Q. And what companies has Experian had that send
7  mass mailings to dispute debt?
8      A. I'm not sure what you mean by "companies."
9      Q. I thought you just said that there was -- you
10 received mass mailings from certain companies.
11     A. How I would categorize that -- and it's just a
12 name I know of -- would be something of a credit
13 clinic-type activity. The exact company I wouldn't
14 know.
15     Q. So Experian has had situations in which they've
16 discovered that something like a credit clinic is
17 disputing debts on behalf of a consumer without the
18 consumer's permission?
19     A. I don't know the relationship on whether there
20 would be permission or not permission. According to the
21 information that I know of, the documents are looked at
22 to see if the information appears to be from the
23 consumer or a third party. Experian takes the privacy
24 of a consumer very seriously and strives to make sure
25 that what we are receiving is actually from the consumer

7 (Pages 25 to 28)

Page 29

1   directly or a reseller.
2       Q.   And your testimony is that, based on what
3   Experian had by way of the envelope, it appeared to be
4   from a third party?
5       A.   That's not the only piece that Experian looks
6   at.  Experian looks at the writing on the envelope,
7   where it was mailed from, the letter itself as well when
8   it's opened.  And what happens is there will be a series
9   of letters that look exactly like that or mailed from
10  the exact post office and they're all in a -- they come
11  from a large bucket from the post office.  So Experian
12  does go through to see if it does appear to be a third
13  party mailing them.
14      Q.   And did you determine, in looking at these
15  documents, that it did come from a third party?
16      A.   What I'm able to review is just the information
17  I have with me today.  I wasn't next to the person that
18  was sorting the mail that day.  But I do see that within
19  Experian's records, we did send a letter to Mr. Collins
20  stating that it appeared that we did get some mail, but
21  quite possibly not directly from you, and asking the
22  consumer if they really were trying to contact Experian,
23  this would be appropriate information to send in.
24      Q.   And that letter that Experian sent, is that
25  automatically done with each consumer dispute?

Page 30

1       A.   No, sir, it's not automatically done.
2       Q.   Okay.  And you don't know -- you haven't talked
3   to the agent who handled that, so you don't know why
4   they would have sent the letter asking for more
5   information from him, do you?
6       A.   It was not a letter asking for more
7   information.  It was a letter advising the consumer that
8   we received something suspicious that appeared to be
9   from a third party.  All I can see is the information
10  within Experian's records.  As far as the agent
11  information, I did not have a discussion with the agent.
12          (Exhibit Number 3 was marked)
13      Q.   Okay.  So you don't know why the agent -- and
14  I'll show you what's -- is this what you're talking
15  about, Exhibit 3?
16      A.   Yes.  This is the letter that was sent based
17  off of that.
18          MR. HANTHORN:  Just to complete it, do you
19  want to give her page 2 of 2 since it says page 1 of 2
20  and you appear to have it in front of you?  Thanks.
21      Q.   (BY MR. SELBY)  Now, when Experian got
22  Exhibit 2, they would -- they then sent Exhibit 3,
23  correct?
24      A.   There's a process that it goes through.  We
25  receive the mail, open the mail, sort the mail.  So

Page 31

1   there's a lot of processes that would lead up to this.
2   But based off of the information that was received at
3   this time, this -- Exhibit 3 -- is what was sent.
4       Q.   Okay.  And what information at the time led
5   Experian to send Deposition Exhibit 3?
6       A.   What the agents are trained to do is look at
7   all the information that's received at that time.  With
8   the fact that it comes through the post office box,
9   we're able to see all the envelopes, all the writing and
10  also the mail correspondence and see where there's a
11  similarity.  So that's how the agents are trained in
12  order to sort the mail.
13      Q.   Okay.  But what about in this situation, what
14  was the reason the agent -- what prompted the agent to
15  send Exhibit 3?
16      A.   It would be everything that was received at
17  that time.  And that's how the agents are trained, to
18  look at all the information that's sent.  And the agents
19  are trained to look for that information to see if it's
20  purported to be from the consumer and look for
21  everything that was similar around it, all the mail
22  correspondence that were mailed at that time -- or
23  received at that time.
24      Q.   But do you know if that was the case in this
25  situation?

Page 32

1       A.   That's how the agents are trained.
2       Q.   I'm not asking you how they're trained.  In
3   this situation, is that -- was that the case?
4       A.   Yes.  Based off of everything that I was able
5   to view, this is -- that's the case.
6       Q.   What was it that you were able to view that you
7   were able to confirm that?
8       A.   Just knowing the -- this particular document
9   format, the information that I've previously seen.
10      Q.   Okay.  What document are you referring to?
11      A.   Not a specific document.  But certainly
12  Experian has received similar documents such as this.
13      Q.   Such as what?
14      A.   Such as this letter from the --
15      Q.   Are you talking about Exhibit 2?
16      A.   -- I apologize -- from the post office box with
17  similar writing on the envelope.
18      Q.   Okay.  Let me make sure I understand what
19  you're saying.  You're saying based -- what you've
20  looked into, that based on the writing on the envelope,
21  somebody sat and compared the writing on the envelope to
22  say that we've gotten the same handwriting before?
23      A.   No, sir.  It's actually looked at at the time
24  that Experian receives the mail.  So Experian would be
25  looking at the entire bucket that's received from the

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 33

1  post office box, and the agents are trained to go
2  through to see what is from the same post office box and
3  the envelope, the information itself, the similar
4  writing, as well as the format and the information
5  within the document itself, the letter.
6      Q.  Okay.  So do you know what it was and what that
7  agent looked at in that "bucket of mail" that made them
8  determine that Exhibit 3 needed to be sent?
9      A.  It would be everything on the envelope, as well
10  as this document.
11     Q.  Okay.  What was it on the envelope itself that
12  made them --
13     A.  It would be in comparison of what was received
14  at that time.
15     Q.  Okay.  Have you done any investigation
16  yourself -- well, has Experian done any investigation to
17  determine whether that's correct or not?
18     A.  I'm not sure what you mean by "correct or not."
19     Q.  That agent actually went -- you could verify
20  that, hey, this is the reason I sent -- if they were
21  asked by their supervisor, Why did you send Exhibit 3,
22  what would they show their supervisor to say, This is
23  the reason I sent Exhibit 3?
24     A.  I'm not entirely sure.  Based on the
25  information I know of, that's the comparison that they

Page 34

1  would make at that time.
2      Q.  And you don't have any personal knowledge of
3  why Exhibit 3 was sent?
4          MR. HANTHORN:  Other than the training
5  that she's talked about, correct?  Can we put that aside
6  so that she --
7          MR. SELBY:  Well, that's not --
8          MR. HANTHORN:  -- doesn't have to keep
9  repeating it?  I know.  But I'm just saying if by
10  personal knowledge you're asking her to put that aside.
11  Is that the question?
12     Q.  (BY MR. SELBY)  Do you have any personal
13  knowledge of why Exhibit 3 was sent?
14     A.  Just based off what I know how the agents are
15  trained.
16     Q.  Okay.  When you're talking about the way
17  they're trained, you're talking about what they're
18  supposed to do, right?
19     A.  Yes.  There's a process where Experian's
20  employees receive the pieces of mail, sort the pieces of
21  mail and then go through another sorting process
22  afterwards.  So there's many steps to get to this point.
23  But, yes, that's how the agents are trained.
24     Q.  Okay.  And so the information you have as to
25  why Exhibit 3 was sent is simply based on how they were

Page 35

1  trained?  That's it?
2      A.  My knowledge of the process and how I was
3  trained, yes, sir.
4      Q.  Okay.  Well, your knowledge of the process
5  overall, but you don't have any knowledge of this
6  individual process?
7      A.  Only --
8          MR. HANTHORN:  Objection; vague.  You may
9  answer.
10     A.  Only the fact that I do know the training that
11  they have and I do have personal knowledge in that
12  training.  So that's all the information that I would
13  know of.
14     Q.  (BY MR. SELBY)  Do you have -- are you aware at
15  all of this particular agent who handled making the
16  decision to send Exhibit 3?
17     A.  I'm not sure what you mean by "aware."
18     Q.  Do you know him?
19     A.  Do I know the person?
20     Q.  Yes.
21     A.  No, I do not.
22     Q.  Okay.  Do you know whether or not they've ever
23  been disciplined in any way for not following
24  procedures?
25     A.  Not that I know of.

Page 36

1      Q.  Would that be important to know?  I mean, I
2  know you've testified that your information is based on
3  their training.  So would it be important to know
4  whether or not the agent has followed their training?
5      A.  Based on the information I was able to review
6  and the fact that I have been the quality auditor
7  previously, it appears that the agent did everything
8  correctly.
9      Q.  Okay.  But would it be important to you to know
10  whether or not that agent has ever been disciplined for
11  not following training?
12     A.  I don't -- as it applies today, that's just not
13  information I've been privy to.
14     Q.  Would that be important to you to know whether
15  or not that agent has ever been disciplined for not
16  following Experian's training?
17     A.  When you say "important," what I'm looking at
18  here today is a process where it was done correctly.  It
19  was not even something that Experian reviewed or thought
20  about.
21     Q.  Well, let's back up.  You're saying your
22  knowledge is based on the fact of how they were trained,
23  correct?
24     A.  Yes, sir.  And when someone -- how someone is

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 37

1  trained is -- you're assuming that they were doing what
2  they were told, how they were trained, correct?
3      A.  To follow Experian's policies and procedures,
4  yes, sir.
5      Q.  Okay.  And in your position of senior legal and
6  compliance, would it be important to you to know whether
7  or not a particular agent had been disciplined at any
8  time before for failing to follow the training
9  guidelines by Experian?
10         MR. HANTHORN:  Objection; asked and
11  answered.  You may answer.
12     A.  As far as any kind of training or quality
13  processes, the agents are reviewed and quality checked
14  monthly.  Beyond that, if there was any issues with a
15  person not following procedures, they would not be
16  employed with Experian.  So there would be a process
17  where that would be already happening.  It's not
18  something that I would have to do post-litigation or
19  have done before.
20     Q.  (BY MR. SELBY)  Yeah.  Alls I'm asking is:
21  Would it be important to you?  Yes or no.
22         MR. HANTHORN:  Same objection.
23     A.  And, again, when you're saying "important,"
24  I -- based on my knowledge, this agent did everything
25  correctly.

Page 38

1      Q.  (BY MR. SELBY)  But that's assuming they have
2  followed the training, correct?  That's what your
3  knowledge is based on?  Because you haven't talked to
4  that agent, right?
5      A.  No, I have not.
6      Q.  Okay.  And your testimony to this point of why
7  Exhibit 3 was sent is assuming that they had followed
8  the training that they had been provided by Experian?
9         MR. HANTHORN:  Objection; asked and
10  answered.  You may answer.
11     A.  Everything that I have knowledge of is from my
12  training, as well as reviewing documents for discovery
13  and looking to see if it was done correctly as well.
14  And according to the information I have and my training,
15  this was done correctly.
16     Q.  (BY MR. SELBY)  But at any point, have you
17  checked on any kind of discipline record of this
18  particular agent?
19     A.  I have not.
20     Q.  Okay.  Have there been Experian agents who have
21  been disciplined for not following the process we're
22  talking about at this point right here between Exhibit 2
23  and 3?
24     A.  I know that --
25         MR. HANTHORN:  So the question, Dave --

Page 39

1  sorry -- is are there agents who have been disciplined
2  for not following the process that leads to Exhibit 3
3  after receiving something like Exhibit 2?  You're
4  limiting it to that at this point, correct?
5         MR. SELBY:  That was the question, yeah.
6         MR. HANTHORN:  Okay.  Sorry.
7      A.  I don't have a -- I'm not privy to exact
8  information like that, but certainly quality is part of
9  Experian's utmost processes.  So that information is
10  constantly reviewed.
11     Q.  (BY MR. SELBY)  Alls I'm asking is:  Are you
12  aware of any agents that have been disciplined for not
13  following the process from what happens from when they
14  get Exhibit 2 to sending out Exhibit 3?
15     A.  I'm just not privy to that.  I would not know.
16  But I do not have personal knowledge of a particular
17  person.
18     Q.  So you are not aware?
19     A.  In my --
20         MR. HANTHORN:  Asked and answered.
21     A.  In my job function, it's not something --
22         MR. SELBY:  No, she's not answering it,
23  Greg.
24         MR. HANTHORN:  Well, actually, she is.
25  She did say she's not aware.  She did say she doesn't

Page 40

1  have personal knowledge, and then you went ahead and
2  asked it again.  So that's why it's an asked and
3  answered objection.  But you may answer.
4      A.  Part of my job functions is not -- it's not
5  knowing particular information about an agent.  And I
6  just don't -- do not have personal knowledge of a
7  particular agent being terminated through this process.
8  I just don't have that information.  I don't know.
9      Q.  (BY MR. SELBY)  Okay.  And I wasn't limiting it
10  to termination.
11         Well, let me ask you this:  When you
12  were -- going back, when you were an agent, were any of
13  your colleagues at that same position ever disciplined
14  by Experian for not following the process, Experian's
15  guidelines, from Exhibit 2 to Exhibit 3?
16     A.  Part of personnel records is private.  I would
17  not know that information, sir.
18     Q.  Okay.  So you're not aware of anybody?
19     A.  I'm not aware of it specifically happening, no,
20  sir.
21     Q.  Okay.
22     A.  I'm unaware of that in this particular process.
23  Being a quality agent, certainly that's something that
24  is checked.  If there was ever any kind of discipline, I
25  just would not have knowledge of it, sir.

10  (Pages 37 to 40)

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 41

1    Q.  Okay.  Were any colleagues of yours, while you
2    were an agent, disciplined in any way for not following
3    Experian's process at any point?  And I'm not limiting
4    it to between Exhibit 2 and 3.  Just as their job as an
5    agent, were they disciplined for not following
6    Experian's guidelines?
7    A.  Absolutely.
8    Q.  Okay.  And who would be watching those agents
9    at Experian?
10   A.  There's a variety of check systems.  I don't
11   know a particular person that would be --
12   Q.  Well, what's the title of a person over the
13   agents that they directly report to?
14       MR. HANTHORN:  Do they have to report,
15   Dave, or do you mean would look for this type of thing
16   also?
17       MR. SELBY:  Well, we can ask both.
18       MR. HANTHORN:  Okay.
19   Q.  (BY MR. SELBY)  What's the name of the position
20   of the person who would be looking over to make sure the
21   agents are doing what they're supposed to do?
22   A.  There's a number of processes that Experian
23   has.  Part of it is a quality check system to check the
24   work that they have done for that month, as well as
25   their own supervisors.  Beyond that, it would be -- it

Page 42

1    could be anybody within Experian checking to make sure
2    that the agents are following policies and procedures.
3    Q.  And what is the -- what's the title of the
4    folks who are directly above agents?  Who supervises the
5    agents?  What are their titles?
6    A.  I just know the name, supervisor.
7    Q.  It's just supervisor?
8    A.  Yes, sir.
9    Q.  Okay.  And then above super--- who watches
10   those supervisors?  What title is above that?
11   A.  I think it's operations manager.  I'm not
12   entirely sure.
13   Q.  Okay.  And above operations manager, who
14   would -- who's above them?
15   A.  I'm not sure of the exact title.  I'm sorry.
16   Q.  Okay.
17       MR. PHILLIPS:  Think we can take about
18   three minutes?
19       MR. SELBY:  That's fine.
20       THE WITNESS:  Thank you.
21       (Recess from 10:17 to 10:28)
22   Q.  (BY MR. SELBY)  In looking at some things that
23   would be -- what are some -- you mentioned a couple
24   things that an agent would look for when they get a
25   letter like Exhibit 2, and you said when looking at a

Page 43

1    mass mailing; is that correct?
2    A.  Yes.  That's the term they used.
3    Q.  Okay.  And by that term, just so we're clear,
4    what do you mean by "mass mailing"?
5    A.  My understanding of what I've seen, when the
6    letters are picked up or delivered by the post office,
7    looking at the envelopes and the font or the -- all the
8    information, it appears that they are exactly the same.
9    So when I say "mass mailing," it's more like mass
10   letters that Experian receives.
11   Q.  All right.  And you mentioned a P.O. Box.  Is
12   that an indicator?
13   A.  Oh, I'm sorry.  No.
14   Q.  It's not?
15   A.  No.  We do have a post office box.  Our
16   consumers --
17   Q.  No.  I'm talking about coming -- whoever it's
18   sent from is a -- I thought you said that a P.O. Box was
19   an indicator.
20   A.  No, sir.
21   Q.  Okay.  And so, generally, it's just simply the
22   agent looking at the box of mail?
23   A.  Looking at the mail, how it's received, how
24   many look exactly the same, as well as opening the mail
25   and looking at the letter as well.  So there's different

Page 44

1    pieces that are put together.
2    Q.  And when the mail's delivered to Experian, is
3    it divided before it's given to an agent any certain
4    way?
5    A.  I believe they actually pick up the mail.  Now,
6    I want to make sure that's clear.  I believe we pick up
7    the mail.  I don't believe it's delivered.  I apologize.
8    Q.  Okay.  Well, once Experian picks up the mail,
9    how is it then sorted?  I mean, who -- does the agent --
10   how do they decide what agent gets what box of mail?
11   A.  Through the process where the information is
12   received, there are instances where the agent would go
13   through the process where they're opening the mail; and
14   it's usually just boxes of -- post office boxes of mail.
15   And through that process, then the agents will sort.
16   And then there's a process where the agents image the
17   document.  And then there's another process where that
18   person will then double-check to see if it needs to go
19   to be sorted for Exhibit 3 type of mailing.
20   Q.  And the person that determines that, is that
21   the same person that stays the agent for the dispute the
22   entire time?
23   A.  Based on this information, I wouldn't call this
24   a dispute, just to make sure that's clear.  And, no.
25   The person that sorts it and -- the person that opens

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 45

1   the piece of mail and the person that sorts it is not
2   the same person that sends the letter.
3       Q.  What would you call Exhibit 2, if not a
4   dispute?
5       A.  According to the information I have, it would
6   be a third-party type of mail purporting to be from
7   Mr. Collins.
8       Q.  Assuming it's from Collins, is it a dispute?
9       A.  It's a letter.  And reading it today, there is
10  information that's being disputed.
11      Q.  And based on what you know today, is Exhibit 2
12  a dispute?
13      A.  It would be -- still looking at the information
14  I was able to view, it would still be considered a
15  third-party type of mail, which would trigger Exhibit 3
16  to be sent.
17      Q.  Even if it's a third-party piece of -- even if
18  that's a third-party piece of mail, is that a dispute?
19  Is a third party disputing it?
20      A.  And this is my terminology.  When I'm talking
21  about a dispute, I'm talking about where an agent is
22  going through and reading the document and starting that
23  process.  Here the agents would not -- there's no agent
24  that would be reading it.  Because it's going through a
25  sorting process, there's not an agent reading it for the

Page 46

1   dispute.
2       Q.  So when it's sorted, it's not an agent reading
3   it for purposes of the dispute?
4       A.  No, sir.  There's no dispute that's --
5       Q.  Who's sorting it?  I mean, what is that person
6   titled?
7       A.  I don't know their exact title.  It would be
8   somebody in the mail room.
9       Q.  Okay.  And then the agent gets it after
10  somebody in the mail room sorts it, correct?
11      A.  Once the piece of mail is opened, it also then
12  goes through an imaging system, and then it's also
13  sorted from there as well.
14      Q.  Okay.  So the person making the determination
15  about the mass mailing is in the mail room?
16      A.  The person that's looking at all of the
17  envelopes and all that information is in the mail room,
18  as well as another person that's looking at the
19  information -- a bundle of the information in the
20  imaging system in order to sort it properly.
21      Q.  But the person who's looking at the physical
22  box that you described earlier of mail, the bundle of
23  mail, that's not the agent that's looking at that as it
24  comes in; that's the person in the mail room?
25      A.  Yes.  The person in the mail room is who is

Page 47

1   looking at how the information is being sent to
2   Experian.
3       Q.  Okay.  The agent does not see that?
4       A.  No, sir.
5       Q.  Okay.  So when the agent would have sent
6   Exhibit 3, they would not have seen the physical mailbox
7   before it was imaged?
8       A.  As far as the -- what the agents see, like I
9   said, there's the mail room and then there's the imaging
10  side; and on the imaging side, that particular agent
11  would have access to all the documents that were imaged
12  around that, so there's an opportunity to look at that
13  again.  So the sorting agent would see that.
14      Q.  Okay.  So it goes from the mail room -- it's
15  opened in the mail room, correct?
16      A.  Yes, sir.
17      Q.  Okay.  Then it's imaged in the mail room?
18      A.  Yes, sir.
19      Q.  Okay.  That's not done by an agent, correct?
20      A.  It's done by a mail room agent.
21      Q.  Okay.
22      A.  I don't know what they're -- if you want to
23  give them a title, I just don't know what that is.
24      Q.  So your mail room agent sorts the mail and
25  images it?

Page 48

1       A.  Yes.  I mean, there is different titles but,
2   like I said, I don't know what their titles would be.
3   But, yes, it would be someone in the mail room doing
4   those functions.
5       Q.  Okay.  And that person in the mail room, once
6   it's sorted and imaged, then it goes to a particular
7   agent?
8       A.  It goes through another sorting process.
9       Q.  Okay.  And --
10      A.  So that sorter would have visibility of all the
11  documents that were received in that bundle and then
12  sort from there.  And then at that point, it would just
13  be sent to have Exhibit 3 sent.
14      Q.  Okay.  And is the person -- so you've got the
15  person in the mail room who opens and images it?
16      A.  Yes, sir.
17      Q.  Okay.  That then goes to a sorting -- or what
18  did you describe?  What's the second step it goes to?
19      A.  The mail room agent opens it, sorts it.  Images
20  is the next step.  And then it goes through another
21  sorting process.
22      Q.  Okay.  And that next sorting process, is that
23  where the decision is made to send Exhibit 3?
24      A.  The decision made as far as looking at all the
25  information, that's where it's double-checked.  So

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 49

1  there's an agent that's sorting the mail -- physical
2  mail. And then once it's imaged, it goes through a
3  double-check system.
4      Q. Okay. And what's the double-check?
5      A. Where that sorter is looking at all the
6  envelopes and information around it, again, to see if
7  the first agent found that there was instances where it
8  had the exact same information appearing to be from a
9  consumer, but appears to be a third party.
10     Q. Okay. And then do factors -- to make that
11 third-party determination, are factors whether or not it
12 was -- return address was handwritten?
13     A. I've seen handwritten. I've seen typed. They
14 just look for similarities.
15     Q. Okay. So look for similarities in handwriting
16 if it's handwritten?
17     A. No, sir. They're not going to be comparing
18 signatures. What the agents are trained to do is look
19 at the bundle of mail that was received and -- what I've
20 actually seen myself is where you can pick up a bundle
21 and flip through it and the handwriting is similar --
22 we're not comparing signatures, but just looks similar
23 -- or the font of the envelopes or when you open up the
24 mail, they all look exactly the same.
25     Q. Okay. And going back to what we had talked

Page 50

1  about earlier, that's what you don't know? You don't
2  know whether that was -- it has not been determined from
3  Experian whether Exhibit 2 was part of a mass mailing or
4  not? That hasn't been factually determined by Experian,
5  has it?
6      A. Based on my review -- again, also a quality
7  review -- it does appear to be a third-party type of
8  mailing.
9      Q. Okay. That's just based on you reviewing the
10 documents, right, that the Jones Day lawyers provided
11 you, correct?
12         MR. HANTHORN: Object; misstates the
13 record. The witness was involved in collecting the
14 documents, as she's testified. So, no, we didn't
15 provide her with the documents initially.
16     Q. (BY MR. SELBY) The documents that you
17 collected were at the direction of Jones Day, correct?
18     A. Yes, that is correct.
19     Q. And the documents that Jones Day instructed you
20 to collect, have you made a -- can you make a
21 determination from looking at those documents whether
22 this, in fact, was part of a mass mailing, Exhibit 2?
23     A. Just looking at Exhibit 2 and what I've seen in
24 the past as far as a process and what the agents were
25 trained, that's what I know of.

Page 51

1      Q. Okay. I'm talking about strictly if somebody
2  said, I want you -- can you make a determination by
3  looking at Experian's document, Exhibit 2, and know
4  whether or not it was a mass mailing?
5      A. Looking at Exhibit 2, you can't just look at
6  that and know --
7      Q. Okay.
8      A. -- that it was a mass mailing or that there was
9  similar envelopes or that it was exactly the same. You
10 would have to look at that at the time or look at the --
11 what the sorter was seeing. Just stand-alone,
12 Exhibit 2, again, without the envelope information, it's
13 just a simple one-page document. There's no way to
14 determine -- the comparison takes place when we see all
15 of the other envelopes.
16     Q. Right. Okay. And without comparing the other
17 envelopes -- you don't have any personal knowledge
18 without comparing all the envelopes whether it was a
19 mass mailing?
20     A. I did not look for any kind of documents around
21 this particular document that were imaged, so it's just
22 based on what I've seen before and the training that the
23 agents have.
24     Q. Okay.
25     A. So beyond that, it would be at the time that

Page 52

1  we'd receive a piece of mail.
2      Q. Okay. So you -- and you just answered my next
3  question. You didn't -- as part of pulling the
4  documents, no one has asked you to pull, nor has it been
5  pulled, any documents to support that it was part of a
6  mass mailing?
7      A. Only the fact that it's -- this is Experian's
8  process following the processes of looking at the
9  envelopes, things of that nature. Beyond that, this is
10 what -- the knowledge that I have.
11     Q. Okay. And the documents that would be looked
12 at to back up whether or not at the time it was a mass
13 mailing when that determination was made, what would one
14 go look at?
15     A. I'm not entirely sure. I know that, through
16 the sorting process, the documents are imaged. There
17 are times when they are in a series. I guess it would
18 depend on how that information is kept. I'm not
19 entirely sure.
20     Q. You don't know?
21     A. I'm just not entirely sure, sir.
22     Q. Okay. If the Court were to order Experian to
23 say, okay, Experian, if your -- part of your testimony
24 is going to be that this Exhibit 2 is a mass mailing,
25 then prove it and provide the documents that would have

13  (Pages 49 to 52)

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 53

1   been received at that time as Exhibit 2, can you do
2   that?
3           MR. HANTHORN: Objection; hypothetical.
4   You may answer.
5       A. I'm not entirely sure as far as how the
6   information's kept. I don't know.
7       Q. (BY MR. SELBY) Okay. And, obviously, because
8   you don't know, that's not something that you looked for?
9       A. No, sir. I just -- when we pulled the
10  documents, I reviewed what was in Experian's records.
11      Q. Does it make a difference whether something
12  comes certified mail or not?
13      A. No, sir.
14      Q. That doesn't make a difference as Experian
15  determining whether or not it's a mass mailing?
16      A. No, sir.
17      Q. Okay. Has that always been your testimony?
18          MR. HANTHORN: Objection; vague.
19      A. I'm not quite sure what you mean by it's always
20  been my testimony.
21      Q. (BY MR. SELBY) Have you ever testified before
22  that if something is received certified mail that it
23  would not be evidence of a mass mailing?
24      A. That it would not be evidence?
25      Q. Yes.

Page 54

1       A. No, I have never testified about that.
2       Q. Okay. And have you testified before that when
3   something is received certified mail, it could still be
4   a mass mailing?
5       A. I don't have a specific memory of testifying
6   specifically about that. What the agents are trained to
7   do is look at the envelopes, whether or not there's --
8   you know, how it's sent in is all looked at the time.
9   It wouldn't make a difference if it was certified or not
10  certified. We're still looking at the exact same
11  information. So it's a comparison.
12      Q. When you were an agent, did you ever have a
13  situation where it was determined that a large mass
14  mailing was done by certified mail?
15      A. I'm not quite sure what you mean.
16      Q. When you were an agent and you were looking at
17  the things that whoever would have sent Exhibit 3 would
18  have looked at, during your time as an agent, did you
19  ever determine that, hey, this was a mass mailing even
20  though they were all certified mail?
21      A. Whether or not they're certified mail, that's
22  just how the information is sent to Experian. Once
23  Experian receives it, Experian goes through the process
24  where it's comparing it. As a dispute agent, if I'm
25  working the piece of mail, I'm not looking for any kind

Page 55

1   of comparison. I'm just looking at the piece of mail.
2       Q. Okay.
3       A. So there's nothing being compared at that time.
4       Q. Okay. As you sit here today, do you know
5   whether or not Exhibit 2 was a mass mailing?
6       A. Based on the information that I was able to
7   review -- and, again, going back to that quality portion
8   of what I know of -- it appears to be a third-party type
9   of letter.
10      Q. Do you know what -- have you read Mr. Collins'
11  deposition testimony?
12      A. I have not.
13      Q. So you weren't aware that he testified that he
14  personally mailed it himself? Were you aware of that?
15      A. I'm just trying to remember if that was a
16  discussion. I'm not quite sure.
17      Q. Okay. Would that make a difference in your
18  opinion?
19          MR. HANTHORN: Let me make sure I
20  understand the question. Are you asking her if the
21  testimony Mr. Collins gave after the lawsuit was started
22  in a deposition would make a difference as to her
23  opinion about what --
24          MR. SELBY: Exhibit 2.
25          MR. HANTHORN: At the time it --

Page 56

1           MR. PHILLIPS: I think he's asking where
2   she contradicts his testimony is what he's asking her.
3           MR. SELBY: Let me just ask it again.
4           MR. HANTHORN: Thanks, Dave.
5       Q. (BY MR. SELBY) Exhibit 2, your opinion as you
6   sit here today, it's a mass mailing, correct?
7       A. That's correct.
8       Q. Okay.
9       A. Looking at the information that I was able to
10  view and the information that's in Experian's records,
11  yes.
12      Q. And would that opinion change if you knew that
13  Mr. Collins has testified under oath that he personally
14  mailed it?
15      A. If Mr. Collins told me or told Experian that he
16  personally mailed it, then I would believe it to be from
17  him.
18      Q. Okay. And were you aware that he told a
19  Jones Day lawyer that he did mail it?
20      A. I'm trying to remember. I'm just not entirely
21  sure of a conversation.
22      Q. But assuming what I'm telling you is correct
23  that he testified that he did mail it, your opinion
24  would change about Exhibit 2?
25          MR. HANTHORN: Objection; asked and

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 57

1    answered.  You may answer.
2        A.  Based on the information that you're telling me
3    today, looking at this letter independently and the
4    information you're saying to me that he did mail it, I
5    would have no other reason to believe otherwise.
6    However, what Experian has within its documents and the
7    information that it received at that time, it did appear
8    to be a third party.
9        Q.  (BY MR. SELBY)  Exhibit 3, with the exception
10   of references to Mr. Collins, is this a form letter?
11       A.  It is a letter that is sent within Experian's
12   system.  And if the same letter was selected, it would
13   be the exact same information, if that's what you mean.
14       Q.  So it's a letter that the agent simply puts in
15   the consumer's name?
16       A.  Being sent to the consumer, yes, this is the
17   letter that we sent.
18       Q.  Okay.  And as an agent, if you were going to
19   send this letter, what would the agent do?  He goes into
20   the system and looks for -- what's this letter called?
21       A.  Internal jargon.  It would be -- I call it a
22   paragraph 513 just because I remember the number.
23       Q.  Paragraph 513?
24       A.  Yeah.
25       Q.  Okay.  Meaning what?

Page 58

1        A.  That's the -- that's the name of this
2    particular letter.
3        Q.  Okay.  And how does it work?  The agent can go
4    in and just types into the system the name, selects the
5    letter and then the system prints this?
6        A.  The system generates this e-mail to the
7    consumer, yes.
8        Q.  Okay.  And where does the system get the
9    consumer's address?
10       A.  It would be from the envelope or the letter
11   itself.
12       Q.  Okay.  So they're sending it to the address of
13   the letter that they got?
14       A.  That's correct, based on the information
15   Experian received.
16       Q.  Okay.  Now, if you go through the letter,
17   looking at Exhibit 3, starting at the beginning, We
18   received a suspicious request regarding your personal
19   credit information that we have determined was not sent
20   by you.  That's what the first sentence says, correct?
21       A.  Yes, sir.
22       Q.  Okay.  And so at this point, Experian is
23   telling Mr. Collins they've already determined that it
24   was not sent by him?
25       A.  Yes.  Based on the information that Experian

Page 59

1    received, that's how it appeared.
2        Q.  Okay.  And other than what you've told me about
3    the mass mailing, do you know of any other information
4    that Experian had that they were basing the statement
5    that they determined that it was not sent by him?
6        A.  I don't have any knowledge of anything else,
7    just the training.
8        Q.  Okay.  The next sentence says, This could be
9    deemed as deceptive or fraudulent use of your
10   information.  What does Experian mean by that?
11   Deceptive or fraudulent use of what information?
12       A.  We wouldn't know why a third party would be
13   contacting Experian using -- or purporting to be from
14   the consumer.  This is more of a warning to the consumer
15   that we received something that just did not appear to
16   be from them.  Due to the sensitive nature of the
17   information that was received, Experian wants to convey
18   that information.
19           We have very private information about the
20   address, Social Security number, things of that nature.
21   So it's Experian's position to advise the consumer that
22   we did receive something.  We don't know what the reason
23   would be.  It just appears to be a third party.
24       Q.  So as far as the use of your information, you
25   don't -- Experian doesn't know.  They just -- their

Page 60

1    position is right now it appears to be a third party?
2        A.  When you say "use of your information," just
3    the fact that we do receive some sensitive information,
4    Social Security number, things of that nature when we
5    say "your information."
6        Q.  That's what Experian means by "use of your
7    information"?
8        A.  That is correct.
9        Q.  Okay.  The next sentence says, We have not
10   taken any action on this request; meaning, at that
11   point, unless Experian hears further, nothing will be
12   done?
13       A.  Just the letter being sent advising the
14   consumer we received something third-party.
15       Q.  Yeah.  I mean, once Exhibit 3 is sent, Experian
16   is saying, Unless we hear back from you, we're not doing
17   anything?
18       A.  That's correct.  We are not -- there's nothing
19   being done as far as --
20       Q.  At that point, Experian isn't going to
21   investigate on its own any further to determine whether
22   or not it is, in fact, from that consumer?
23       A.  What Experian does is mail the letter to the
24   consumer.  And based on that, if Experian hears back,
25   then we believe it to be the consumer advising that they

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 61

1     are the ones that are disputing the information.
2         Q.  But if Experian doesn't receive anything in
3     response to Exhibit 3, Experian doesn't do anything on
4     their own to determine whether or not it is that
5     consumer?
6         A.  No, sir.
7         Q.  It goes on to say, Any future request made in
8     this manner will not be processed and will not receive a
9     response.  Explain to me what that means.
10        A.  This type of letter is a courtesy letter.  As
11    far as if we were to continue to receive the exact same
12    information, just another letter, a courtesy letter
13    would not be sent.
14        Q.  You're calling Exhibit 3 a courtesy letter?  Is
15    that how you termed it?
16        A.  That's how I term it, yes.
17        Q.  Okay.  And so the courtesy letter is telling
18    the consumer that any future request made in this manner
19    will not be processed and will not receive a response.
20    What does Experian mean by "made in this manner"?
21        A.  As far as when the information was received,
22    manner being how it was received and appearing to be a
23    third party.
24        Q.  Was -- the manner in which it was received by
25    Experian, the next time did it appear to be from a third

Page 62

1     party?
2             MR. HANTHORN:  Objection.
3         A.  The next time that we found within Experian's
4     documents was a letter that enclosed ID and a copy of a
5     Social Security card, so Experian believed that to be
6     from the consumer.
7         Q.  (BY MR. SELBY)  I think you testified -- I
8     mean, the address that's on Exhibit 3, that address was
9     obtained from the letter on Exhibit 2 -- or, excuse me,
10    from the address on Exhibit 2?
11        A.  As far as the process, what the agents would do
12    is when Experian receives any kind of either disputes or
13    we're sending paragraphs, things of that nature, they
14    have an ability to go in and make what's called an edit
15    to the report itself and generate -- there are
16    oftentimes when there is additional information that we
17    might not see here.  For instance, we have the third, so
18    that could have been something that was given to
19    Experian on a previous disclosure.  That information is
20    not removed when it's sent again.  So, I mean, there
21    might be differences.  But, yes, the -- the address
22    itself does come from the letter.
23        Q.  Okay.  Why does Experian mail a letter
24    regarding suspicious activity back to the same address
25    that they believe they got suspicious activity from?

Page 63

1             MR. HANTHORN:  The witness may answer, but
2     the person who has been designated to discuss systems
3     issues is the person who's going to be here later today;
4     so this testimony will not bind Experian.  Of course,
5     you're perfectly -- you may ask the question.  I just
6     didn't want to have you go down this road, given that
7     there's somebody else who will be designated for matters
8     of that sort.  You may answer.
9         A.  I'm sorry.  I forgot the question.  Could you
10    repeat that, please?
11        Q.  (BY MR. SELBY)  Why does Experian send
12    Exhibit 3 to the same address of a letter that they are
13    claiming is suspicious?
14            MR. HANTHORN:  Same objection.  You may
15    answer.
16        A.  Experian's not saying that the address is
17    suspicious.  Experian is saying that the information
18    that was sent and how it was sent is suspicious.  As
19    long as that address is on file with Experian's records,
20    then we will go ahead and send out the letter.
21        Q.  (BY MR. SELBY)  Before sending Exhibit 3, does
22    Experian look to see if that address is on file before
23    making a determination, hey, should we send Exhibit 3?
24            MR. HANTHORN:  Same objection.  You may
25    answer.

Page 64

1         A.  I believe so.  I know that the agents are
2     trained to look at -- actually what happens is once the
3     agents edit the information and process the letter, the
4     agents would get a pop-up that shows that the address is
5     not on file.  And in that case, if they get a pop-up,
6     they might do something different.  I'm not
7     entirely sure if this particular letter would be
8     generated or not.
9         Q.  (BY MR. SELBY)  When you were an agent, if you
10    got Exhibit 2 and it was coming to you under the process
11    prior to getting to you of the auspices of being a mass
12    mailing and then you go do Exhibit 3 and you pull it up
13    and it's got the same address, does that change your
14    mind of whether to send Exhibit 3 or not, as an agent
15    when you were doing it?
16        A.  I -- as an agent, I did not process things like
17    Exhibit 3, so I don't have that personal knowledge of
18    processing that.
19        Q.  Okay.  So as an agent, you never handled
20    sending letters like Exhibit 3?
21        A.  No.
22        Q.  So your only experience with Exhibit 3 is in
23    your position now?
24        A.  No, sir.  Also, as a quality auditor, I did
25    check that kind of information during that position.

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 65

1    Q.  Okay.  As a quality auditor in checking that
2    kind of information, would it make a difference
3    before -- would it make a difference to you in auditing
4    that of whether an agent should have sent Exhibit 3 if
5    the same address matched what you had in your system?
6          MR. HANTHORN:  Dave, can I have a
7    continuing objection to this line so that I don't have
8    to keep objecting to the form?
9          MR. SELBY:  Yeah.  And I'm just asking --
10   this is now her personal knowledge.
11         MR. HANTHORN:  I understand that.  And
12   it's clear that you are.  But I don't want to have to
13   keep --
14         MR. SELBY:  That's fine.
15         MR. HANTHORN:  You may answer.
16   A.  As far as the address being on file, that
17   information is not looked at when determining if it's
18   sent by a third party.
19   Q.  (BY MR. SELBY)  Okay.
20   A.  So having the consumer's address would just be
21   something that would be there as the address we can
22   convey information to.
23   Q.  Okay.  The next sentence says, Suspicious --
24   and I'm on Exhibit 3 still -- Suspicious requests are
25   taken seriously and reviewed by Experian's security

Page 66

1    personnel who will report deceptive activity, including
2    copies of letters deemed as suspicious to law
3    enforcement officials and to state or federal regulatory
4    agencies.
5          Who currently is in charge of security
6    personnel at Experian?
7    A.  Tim Puckett.
8    Q.  Tim Puckett?
9    A.  Yes, sir.
10   Q.  Okay.  And have you spoken with Tim Puckett
11   about anything to do with Curtis Collins?
12   A.  No.
13   Q.  Based on your review of the file and the
14   documents, did anybody ever report anything to
15   Experian's security personnel regarding Curtis Collins?
16   A.  No.
17   Q.  Based on your review of the documents for
18   Curtis Collins, was it ever determined that there was
19   any deceptive activity?
20   A.  No.
21   Q.  Was it ever determined that there were copies
22   of letters deemed as suspicious?
23   A.  Only the fact that it appeared -- the letter
24   appeared to be a third party.  Other than that, no.
25   Q.  And if a letter appears to be from a third

Page 67

1    party and, in Experian's estimation, that's deemed as
2    suspicious, is that reported to law enforcement
3    officials?
4    A.  This is basically saying that Experian will
5    cooperate with law enforcement officials.  There would
6    have to be a reason for that kind of activity.
7    Q.  Would -- the fact of a letter's deemed
8    suspicious as being from a third party, would that
9    trigger Experian contacting law enforcement officials?
10   A.  All the information is looked at.  So whether
11   or not Experian would receive information, either
12   fraudulent documents, things of that nature, there are
13   times when Experian does participate when contacted by
14   law enforcement.  Beyond that, I just wouldn't be privy
15   to specifics.
16   Q.  Okay.  But would just the simple fact of it
17   coming from a -- if it was -- if it was determined --
18   let me ask it this way:  If it was determined to be from
19   a third party, does Experian report that fact alone to
20   law enforcement?
21   A.  On an individual basis, I do not believe so.
22   Q.  Okay.
23   A.  If there's any other research, I wouldn't know
24   of it.
25   Q.  And then it goes on to say, "to law enforcement

Page 68

1    officials," and it says, "to state and federal
2    regulatory agencies."  What is Experian referring to
3    when they say a state agency?  What state agency are
4    they referring to?
5    A.  I'm not entirely sure.  I know that for federal
6    regulatory agencies, it would be more of like the FTC.
7    Beyond that, I'm just not exactly sure who that contact
8    would be out of state.  I don't know.
9    Q.  Okay.  And federal regulatory agencies, you're
10   saying that it would be the Federal Trade Commission?
11   A.  Yes, sir.
12   Q.  Okay.  In your position now, do you deal at all
13   with the Federal Trade Commission?
14   A.  No, sir.
15   Q.  Have you ever had any conversations with
16   anybody at the Federal Trade Commission since you've
17   been employed at Experian?
18   A.  No, sir.
19   Q.  In your present position, have you referred to
20   any Federal Trade Commission opinions or regulatory
21   documents?
22   A.  I believe in interrogatories there might be a
23   commentary.  I'm not entirely sure.
24   Q.  Other than what is in some interrogatories,
25   have you, yourself, referred to any Federal Trade

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 69

1  Commission regulations or opinions for purposes of your
2  job?
3          MR. HANTHORN:  You mean directly referred
4  to them as opposed to directly read the opinion or the
5  reg, correct?
6     Q.  (BY MR. SELBY)  Have you ever read them?
7     A.  Not in its entirety.
8     Q.  Other than what the attorneys may suggest you
9  read, have you ever read any of the Federal Trade
10 Commission regulations?
11    A.  Not in its entirety.  I don't --
12    Q.  I'm not -- I'm not asking in its entirety, but,
13 I mean, have you ever read any of the Federal Trade
14 Commission regulations that would relate to what you do
15 outside of your attorneys instructing you to?
16    A.  What I'm familiar with is policies and
17 procedures that were designed through Experian's legal
18 counsel.  Beyond that, I just would not have reason to
19 read any form of law.  I'm not an attorney.
20    Q.  So beyond what they've told you, you wouldn't
21 have any reason to read it?
22          MR. HANTHORN:  Asked and answered.
23    A.  I just wouldn't remember if there's a
24 particular time -- I just -- I don't know.
25    Q.  (BY MR. SELBY)  Okay.  In your present

Page 70

1  position, what is the federal act that you deal with on
2  a -- what's the overriding federal act that you have to
3  deal with?
4     A.  I'm not sure what you mean by "act."
5     Q.  Were there any particular federal legislation
6  by what it's termed that you deal with in your position
7  now?
8     A.  Again, I'm not entirely sure on what you mean.
9  As far as any regulations or any laws that we abide by,
10 that would be determined from Experian's counsel.  What
11 I have knowledge of would be Experian's policies and
12 procedures.
13    Q.  Now, on Exhibit 3, it also -- it tells
14 Mr. Collins -- it says, If you believe your information
15 in your personal credit report is inaccurate or
16 incomplete, please call us at the phone number that
17 displays on your Experian personal credit report or
18 visit our secure Web site, and it gives an address
19 there.  It says, You also may write to us at the address
20 on your Experian personal credit report.
21          Now, where it says, If you believe the
22 information in your personal credit report is inaccurate
23 or incomplete, on the first letter, Exhibit 2, that's
24 what Mr. Collins was saying, is that right, that he
25 believed that his personal credit report was inaccurate?

Page 71

1     A.  Based on what I know today from what I've been
2  told by you that Exhibit 2 was mailed by Mr. Collins at
3  that time that Experian received it, looking at the
4  information that was received, there was not an Experian
5  agent that read into anything within that letter.
6     Q.  What do you mean, "read anything into that
7  letter"?
8     A.  There was not a particular agent reading this
9  letter.  It was a comparison to see if this was from a
10 third party in generating Exhibit 3.  There's not a
11 particular agent that would be reading anything within
12 this letter.
13    Q.  So no one at Experian would read the substance
14 of the letter before sending Exhibit 3?
15    A.  No, sir.
16    Q.  And is that the standard procedure at Experian?
17    A.  Yes, sir.  Based on the information that I know
18 of, it would be looking at how the information was sent
19 to Experian and looking at the information itself as far
20 as comparison to format, but not reading the letter
21 itself.
22    Q.  And in Exhibit 3, it's telling the consumer --
23 it says, You can write to us at the address on your
24 Experian personal credit report.  And it goes on to say,
25 Be sure to include all of the following.  Why is it

Page 72

1  asking for all this information?
2     A.  As far as the ID information, in order for
3  Experian to access the consumer's report, we do need
4  specific ID information.
5     Q.  And is this information to also verify whether
6  or not the information was sent by the consumer?
7     A.  That's not always the case.  We do have the
8  situation where we have the letter that appeared to be
9  from a third party that has all of the identifying
10 information.  So as far as the identifying information,
11 it would be how Experian would access to file itself.
12    Q.  Well, Exhibit 3 tells them we -- it's telling
13 the consumer, We got a suspicious request regarding your
14 personal credit information that we have determined was
15 not sent by you, correct?  They're telling them that in
16 Exhibit 3?
17    A.  Yes, sir.
18    Q.  Okay.  And they're telling them, Hey, here's
19 what we need, and they're saying, We need -- you need to
20 include all the following:  Full name, and it goes on.
21 We'll read that into the record in a second.  But it's
22 asking for certain information, correct?
23    A.  Certain ID information, that's correct, sir.
24    Q.  Okay.  And the purpose of asking for that ID
25 information is because Experian's telling them we've

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 73

1  gotten a suspicious request, according to Experian?
2      A.  No, sir.  We're not asking for the ID
3  information because we had a suspicious request from a
4  third party.  What Experian's asking in order to process
5  the dispute is to send the proper ID in order for
6  Experian to access the report.
7      Q.  Okay.  Let's just go through it.  It says, Be
8  sure to include all of the following.  And, first of
9  all, it says, Your full name, including middle initial
10  and generation, such as Jr., Sr., II or III, correct?
11      A.  Yes.
12      Q.  Okay.  The next says to include Social Security
13  number; is that right?
14      A.  Yes, it does say Social Security number.
15      Q.  And it says to include your current mailing
16  address, correct?
17      A.  Yes, it says mailing address.
18      Q.  Okay.  It says to include your date of birth,
19  correct?
20      A.  Yes, it has date of birth.
21      Q.  And previous addresses for the past two years,
22  correct?
23      A.  Yes.  That's what it says.
24      Q.  Okay.  And your testimony is that's just for ID
25  information purposes?

Page 74

1      A.  Absolutely.
2      Q.  Okay.  So the information that you would get
3  back from the consumer in response to Exhibit 3, all
4  this information here would be nothing other than for
5  just ID purposes?
6      A.  That's correct, in order to access the report
7  itself.
8      Q.  It --
9      A.  Experian would not need all that information.
10  A consumer can just add the report number that they
11  previously received and we can access the report, as
12  long as it just did not appear to be from a third party.
13  So that's the information -- the ID information is what
14  we would look for in order to access the report.
15      Q.  The first letter that was sent by Mr. Collins,
16  Exhibit 2, when you talk about the report number, is
17  that the same thing as the account number?
18      A.  No, sir.
19      Q.  Okay.  So the account number is different than
20  the report number?
21      A.  Yes.
22      Q.  Okay.  What is the account number?
23      A.  An account number is going to reference to an
24  actual trade item on the report.
25      Q.  How would somebody get an account number trade

Page 75

1  item?
2      A.  I'm not sure what you mean.
3      Q.  How do you get that -- how does somebody get
4  that number?  Where would Mr. Collins have gotten that
5  number from?
6      A.  It could be from an Experian report.
7      Q.  Is that number going to be anywhere other than
8  on an Experian report?
9      A.  If a third party pulled Mr. Collins' report and
10  Mr. Collins saw that, it would be there.  Other than
11  that, possibly through the company itself.  I wouldn't
12  know.
13      Q.  Through what company?
14      A.  Through Equable or any other company itself.
15          MR. HANTHORN:  And just so we'll know what
16  we mean when we read this later, that's Equable Ascent
17  Financial, the company referenced in the letter, Dave.
18      Q.  (BY MR. SELBY)  In Exhibit 3, the last full
19  paragraph says, Include the account name and number for
20  any item on your credit report that you wish to dispute
21  and state the specific reason why you feel the
22  information is inaccurate.  Is that what it says?
23      A.  Yes, sir.
24      Q.  Okay.  Was that information included in the
25  first letter that Experian received from Mr. Collins?

Page 76

1      A.  And, again, going back to Exhibit Number 2, at
2  the time that Experian received it, it did not appear to
3  be sent by Mr. Collins, but a third party.  In looking
4  at the letter today in Exhibit 2, it does have that
5  information.
6      Q.  The next sentence says, We will ask the data
7  furnisher to review their records and verify the
8  information.  And who is the data furnisher in this
9  situation?
10      A.  Well, in any situation, even in this one,
11  Equable would be the company that's supporting the
12  information.  So if the consumer gave a specific name,
13  that's the company -- the source of the information we
14  would contact.
15      Q.  Did Experian ever contact the data furnisher to
16  review their records to verify the information prior to
17  sending Exhibit 3?
18      A.  Exhibit 2 appeared to be a third party.  So,
19  no, there was nothing sent to that company.
20      Q.  If you look at the bottom on Exhibit 3, do you
21  know what these numbers mean at the bottom?  Do they
22  have any kind of meaning to you, starting out with
23  000394?
24      A.  That's the consumer's personal identification
25  number.

Page 77

1    Q.  Is that personal only to that consumer?
2    A.  Yes.  It would be that consumer's personal
3  identification number.
4    Q.  Okay.  Is Experian the only one that would have
5  that information?
6    A.  It's something that is just in Experian's
7  records.
8    Q.  Okay.  And what's that -- what's that number
9  used for?
10    A.  My general knowledge of that would be a
11  consumer is assigned a personal identification number
12  that would associate with just that consumer.  On a
13  system level, I don't have that kind of knowledge.
14    Q.  Is that number on the credit report anywhere?
15    A.  And just to be clear, when we say credit
16  report, I'm thinking of a third party.  Otherwise, are
17  we talking about a disclosure?
18    Q.  Either one.
19    A.  I don't have copies of any credit reports that
20  were accessed by a third party.  What I would have
21  within Experian's records would be disclosures.
22    Q.  Is that on the disclosures?
23    A.  Yes.  It would be on the -- yes, sir.
24    Q.  Okay.  And that's the same for any consumer?
25  It's not just limited to Mr. Collins?

Page 78

1    A.  That's correct.
2    Q.  And the same with Exhibit 3?  If a letter like
3  this is mailed to a consumer, it's -- that number -- the
4  personal ID number is placed on that letter?
5    A.  Again, on a system kind of level, I don't have
6  that kind of knowledge.  What I know of would be that's
7  the personal identification number for a consumer.
8  Beyond that, I just don't have specific knowledge of it
9  generating there.
10    Q.  Okay.  What's the other number, starting with
11  the letter L?
12    A.  I don't know.
13    Q.  Looking at the top of Exhibit 3 it says, Report
14  date, August 9th, 2010.
15    A.  Yes, sir.
16    Q.  What is that referring to?
17    A.  That's referring to the date that this
18  particular letter was generated.
19      MR. HANTHORN:  Exhibit 3?
20      THE WITNESS:  I'm sorry.  Exhibit 3, yeah.
21  Sorry.
22    Q.  (BY MR. SELBY)  That's the date that Exhibit 3
23  was -- that's the date of Exhibit 3, of when it was
24  sent?
25    A.  When it was sent, that's correct.

Page 79

1      (Exhibit Number 4 was marked)
2    Q.  Let me show you Exhibit 4 and ask you if
3  that -- is Exhibit 4 what Experian received from
4  Mr. Collins in response to Exhibit 3?
5    A.  What I can tell you, it is after Exhibit 3
6  being sent.  And Exhibit 4 shows a letter disputing
7  information.  I can't tell you if that was generated
8  because of Exhibit 3 or not.
9    Q.  If it was not generated in response to
10  Exhibit 3, would it matter?
11      MR. HANTHORN:  Objection.  You may answer.
12    A.  I'm just not entirely sure on the reasons for
13  receiving letters if I'm not that consumer myself.  So I
14  don't know what would trigger a letter.  What I can tell
15  you is, based on the information within Experian's
16  records, that Exhibit 4 came after Exhibit 3 was sent to
17  the consumer.
18    Q.  (BY MR. SELBY)  Okay.  Does Exhibit 4 answer
19  any of the questions raised in Exhibit 3?
20    A.  It's not referencing Exhibit 3.  It's not
21  exactly answering the fact that there was something
22  sent.  What I can tell you is what Exhibit 4 says and is
23  disputing information; and that's all the information we
24  have at this time.
25      MR. HANTHORN:  Well, go ahead and look at

Page 80

1  the second page, too.
2    A.  Including the driver's license and Social
3  Security card that were included within this particular
4  document as well.
5      MR. HANTHORN:  And just as an objection,
6  there is a full copy -- so the objection is under the
7  rule of completeness -- that is three pages that has
8  been provided by Experian.  And, Dave, the only
9  difference is I think it includes the envelope.  I mean,
10  it's the same thing as these two that you're giving us,
11  which came from Mr. Collins.  Ours have Bates numbers on
12  them and they show the envelope that it came from.
13      MR. SELBY:  Yeah.  And, in fact, I'll be
14  glad -- and we can just do it for the record, if we want
15  to stipulate that y'all can substitute --
16      MR. HANTHORN:  I don't want to substitute.
17  I want it to be clear what was in front of the witness.
18  But --
19      MR. SELBY:  Okay.  You don't want to
20  substitute it?
21      MR. HANTHORN:  No, because the witness did
22  not have that in front of her when she was testifying.
23  She had what you provided her.  If you want to add it at
24  the end, that's fine, too, and we'll point out that it
25  refers to it.  But, no, I don't want to make it look

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 81

1  like the witness had something in front of her she
2  didn't.
3          THE WITNESS:  Can we take a break?
4          MR. HANTHORN:  Yeah.  Is that okay?
5          MR. SELBY:  Yeah.  That's fine.
6          (Recess from 11:24 to 11:31)
7          (Exhibit Number 5 was marked)
8      Q.  (BY MR. SELBY) I'll show you what I'm going to
9  mark Exhibit 5 and ask you, if you will, to identify
10 that, please.
11         MR. SELBY:  Exhibit 5 also, for the
12 record, is Bates stamped Experian's Document 509.
13     A.  Exhibit 5 is a -- what's called a D/R log
14 showing if there's any kind of communication with either
15 the data furnisher or the consumer, and it would be
16 logged in this form.
17     Q.  (BY MR. SELBY) Okay.  This is showing if
18 there's any communication between, in this situation,
19 Equable and the consumer?
20         MR. HANTHORN:  Objection; misstates what
21 the witness said.
22     Q.  (BY MR. SELBY) Say it again.  I thought that's
23 what you said.
24     A.  As far as the -- this particular document is
25 going to house any kind of communication either by an

Page 82

1  ACDV or information that's being generated to the
2  consumer.  So it's also going to house any kind of
3  letters or things like that that are mailed from
4  Experian's system to the consumer.
5      Q.  Okay.
6      A.  Along -- there's usually another part that goes
7  with this, which would be the disclosure log, that would
8  also house more information as far as communications
9  with the consumer.
10     Q.  And if you just go through this, the D/R log
11 report requesting agent, that's who would request the
12 report?
13     A.  Yes.  TX030406 is myself.
14     Q.  Okay.  And when did you request the report?
15 What date do you look at to see the date?  Is that the
16 report date?
17     A.  There is a report date.  I don't know if
18 that's -- it just shows 3/17 on this particular
19 document.  And it would be at direction of counsel to
20 print this kind of report.
21     Q.  Okay.  The end date, what is that?
22     A.  I'm not entirely sure.  I'm not entirely sure.
23     Q.  Okay.  Begin date, what is that, over to the
24 left?
25     A.  It's just a date that I've always put in just

Page 83

1  to make sure we capture everything.
2      Q.  And then dispute cycle, what does that mean?
3      A.  The dispute cycle is going to house the
4  disclosure number that was generated that's used within
5  the D/R log.  So we have 2552331067, which shows the
6  report number that was used to access the file on that
7  date.
8      Q.  And then number of disputes says 001.  Does
9  that mean that's the number of disputes from this
10 consumer?
11     A.  This is going -- the D/R log houses the
12 information that is captured from this particular
13 contact or dispute itself on 9/3/2010.  So based off of
14 this particular contact, there is one ACDV being sent.
15 If there was anything else, any other kind of disputes,
16 it would just follow the process of a numbering system.
17     Q.  Okay.  I'm not sure I followed you there.  So
18 when it says, "Number of disputes," and it says, "001,"
19 is what you're saying is it will always show 1 when you
20 run this report because the report's done for each
21 dispute, the log report?
22     A.  And when you say "dispute," what I'm looking
23 at, this information, there could be name variation
24 disputes, there could be address disputes or things of
25 that nature that could make that 1 be 2, 3, 4 and 5.

Page 84

1  It's just going to house the 9/3/2010 contact and the
2  number of requests, changes or ACDVs that were being
3  generated at that time.
4      Q.  So then the "Disputes Completed" means what?
5      A.  That that cycle was closed.
6      Q.  And when was it closed?  As of when, according
7  to this?
8      A.  According to this document, we have a CDF
9  generated on 9/9/2010.
10     Q.  Okay.  And was it closed on that date or the
11 dispute completed on that date, according to Experian?
12     A.  According to this information, yes.
13     Q.  Is that, in fact, correct?
14     A.  On the CDF itself would be 9/9/2010, and I
15 believe that I did see that same date on the other
16 documents.
17     Q.  And then the date that the CDF is due is
18 9/30/2010.  What's that for?
19     A.  The 30-day cycle starts when the dispute date
20 is sent.  So the dispute would be closed and updates
21 changed or deleted if we did not receive a response back
22 from Equable.  So we would have until 9/30/2010 to
23 receive a response.
24     Q.  Go on down where it uses the word "Purge" and
25 it has a date of 12/13/2015.  What does that mean?  What

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 85

1   is it purging?
2       A.  It would be based on the information that was
3   reported by Equable.  So it would be purging from an
4   original delinquency date.
5       Q.  Why is it 12/13/2015?
6       A.  I'm not entirely sure the actual reason for
7   that.  I would have to look within Equable's -- what's
8   reported by Equable.  Just looking at it based on this
9   document, it's just a -- this is a purge date that
10  Experian would use, but we also look in the account
11  itself where that information's coming from.  By looking
12  at this today, it would be something reported by
13  Equable.
14      Q.  So you're saying based on the information that
15  Experian has from Equable is the reason it's not going
16  to be purged until 12/13/2015?
17      A.  Equable would give Experian an original
18  delinquency date.  Based off of that information, that's
19  where that purge would come from.
20      Q.  Why would an original delinquency date matter,
21  given the information that's in the log report about the
22  fact that he won a judgment against Equable?
23      A.  The only reason why that's there is because
24  it's something that's displayed on a consumer's file
25  just for their information.

Page 86

1       Q.  For whose information?
2       A.  A consumer's information.
3       Q.  The purge date is for the consumer information?
4       A.  Yes, sir.
5       Q.  Okay.  And what is Experian -- what information
6   is Experian giving the consumer?
7       A.  On the consumer report itself, I'm not sure
8   that that's the exact same terminology, but it would
9   show that that would be a date that this particular
10  account would come off the file.
11      Q.  So this particular account, this Equable Ascent
12  Financial won't come off his file until 12/13/2015?
13      A.  I believe Equable, post-litigation, did delete
14  the account, so it's not there right now.  But based on
15  the information that was reported by Equable, that's the
16  date that it would be purging.
17      Q.  Well, other than what was reported by Equable,
18  what did Experian do on their own to determine whether
19  or not the file should be purged at the same time it's
20  deleted -- the trade line is deleted?
21      A.  I want to make sure that I'm clear on that.
22  This is generated on 9/3 -- or that date is generated on
23  9/3/2010.  It's a snapshot of what that account looked
24  like.  Right now, there would be no purge of 12/13/2015
25  because it is deleted.

Page 87

1       Q.  Okay.  Is it a hard delete or a soft delete?
2       A.  What Experian does is add a -- it's called a
3   soft delete.  So it captures everything that was
4   reported to Experian so that that information --
5   specific information does not come back to file again.
6       Q.  So what's the difference between a soft delete
7   and a hard delete?
8       A.  On a system level, I really don't have that
9   kind of information.  What I do know of would be
10  something that we would have as far as a soft delete
11  flag.  It would be visible just to Experian, but not to
12  the consumer or a third party, and it's just to make
13  sure that the information does not come back to file.
14  Anything else I just would not have knowledge of.
15          MR. HANTHORN:  And that's once it's been
16  determined to delete something as opposed to purge.
17      Q.  (BY MR. SELBY)  So does a soft delete
18  completely remove the trade line within Experian's own
19  records, the dispute trade line?
20      A.  I don't know if it ever completely goes away.
21  My understanding is it's visible to Experian only, and
22  that's to make sure that that very specific information
23  does not come back to file.  Beyond that, on a system
24  level, I just would not know.
25      Q.  And when you say to make sure it wouldn't come

Page 88

1   back to file, explain to me why a soft delete, in
2   keeping the information, would ensure that it doesn't
3   come back to file?
4       A.  What specific information that the system looks
5   at is not information that I would have knowledge of.  I
6   can just tell you what the soft delete that I would use
7   for my day-to-day job duties.
8       Q.  When would you do a hard delete in your
9   day-to-day job duties?
10      A.  I don't know.  It's not part of my job duties.
11  I have no idea --
12      Q.  You don't know?
13      A.  -- of that process.
14      Q.  You don't know?
15      A.  No.
16      Q.  At any position you've ever had at Experian,
17  would you be the agent or individual -- well, would --
18  in your position as an agent, would you have been the
19  one putting in information whether or not something was
20  a soft delete or a hard delete?
21      A.  My understanding is we soft delete with an
22  exclusion code.  I heard the word "hard delete."  It's
23  just not something I would have specific system
24  knowledge of.
25      Q.  So your experience, then, is that Experian, for

Page 89

1 purposes of deleting, only has a soft delete?
2      MR. HANTHORN: Objection. She said she's
3 heard the term, so it exists. She said she didn't use
4 it. So you're mischaracterizing what she just said.
5    Q. (BY MR. SELBY) Okay. Let me make sure I
6 understand what you're saying, then. Is there such a
7 thing as a hard delete?
8    A. On a system level I've heard the term, but I
9 don't -- it's not something that I would even have
10 knowledge of. I've just heard the term.
11    Q. Okay. You've heard the term, but do you know
12 whether hard delete is used by Experian?
13    A. I don't know on a system level. I just don't
14 have that knowledge, sir.
15    Q. Okay. In your experience in the position
16 you're in now and all the depositions you've given, have
17 you ever had a case where it's anything other than a
18 soft delete where a trade line is disputed?
19    A. When I think of a hard delete, I think that I
20 just don't see that information within Experian's
21 records. Beyond that, I don't know of a specific
22 deposition where that came up. I just don't know.
23    Q. Okay. You don't know the situation where a
24 hard delete came up or you don't know a situation
25 where -- well, explain to me what you mean by that, a

Page 90

1 situation where it came up.
2    A. As far as a hard delete, my understanding of it
3 just means that Experian can't see it, that if I was to
4 pull up an admin report, it wouldn't be there. Beyond
5 that, I don't have that system knowledge to know if
6 that's what happened, things of that nature, and I don't
7 know of a specific time when it did. I just wouldn't
8 have knowledge of that. I have knowledge of the soft
9 delete and how I see that information.
10      MR. HANTHORN: David, it's your
11 deposition. Use your time as you wish. But you are
12 getting into system areas. To the extent you want that
13 there's a witness who's prepared to testify on a more
14 system-wide basis.
15      MR. SELBY: Yeah. The only reason -- I
16 mean, she --
17      MR. HANTHORN: That's fine.
18      MR. SELBY: I mean, she testified that
19 she's the one who ran the report, so that's the reason
20 I'm asking.
21      MR. HANTHORN: Okay.
22    Q. (BY MR. SELBY) The agent ID on here that's
23 about halfway down --
24      MR. HANTHORN: Is that the one that begins
25 "PB"?

Page 91

1      MR. SELBY: I didn't see that one. I was
2 looking at the one that's "AU."
3      MR. HANTHORN: Okay. Hold on. Let me
4 find the one you're looking at.
5      MR. PHILLIPS: Middle of the page.
6      MR. HANTHORN: Got it. She's there.
7    Q. (BY MR. SELBY) Okay. That is the agent who
8 did what? When you look at this log report and somebody
9 says, okay, whoever this agent is that's identified as
10 AU000001, what did they do in the history of this?
11    A. Received the response from Equable. Received
12 the ACDV response.
13    Q. Okay. And then would that person who's
14 identified -- that agent that's identified by that ID
15 number, are they the ones that would have made the
16 decision to hard delete or soft delete?
17    A. There's no decision being made. My
18 understanding, there's no hard delete that happens
19 through the reinvestigation process.
20    Q. Okay.
21    A. Anything related to a hard delete is just
22 not -- it's more of a system thing, and I would not have
23 knowledge of that, sir.
24    Q. But would this agent have been the one to enter
25 the soft delete?

Page 92

1    A. Yeah. On the response side -- if there was a
2 deletion happening, it would be on the response side.
3      MR. HANTHORN: And just to be clear, you
4 know, David, that no soft delete is reflected as having
5 been entered by this document. I don't think you meant
6 to mislead the witness, but --
7      MR. PHILLIPS: Well, just let her testify
8 to that.
9      MR. HANTHORN: I did, and she did. I just
10 wanted to make sure that your colleague wasn't confused
11 about where we were.
12      MR. PHILLIPS: I didn't -- honestly, I
13 didn't hear her testify to that.
14      MR. SELBY: I didn't either.
15      MR. HANTHORN: Okay.
16    Q. (BY MR. SELBY) Do you understand what he's --
17 what your attorney is saying?
18    A. Yes, sir. If there was a delete, we would see
19 that in the response section, down here in the response
20 area.
21    Q. If there was a delete?
22    A. Yes, sir.
23    Q. Okay. So what does it mean when it says,
24 Update data equals soft delete?
25    A. Any time that we have this type of dispute

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 93

1   reason, "Consumer states inaccurate info.  Provide
2   complete ID," what that is is going to capture not only
3   a status dispute, but also an ownership dispute, which
4   makes this -- and if you look right above that soft
5   delete is a D.  So if we did not get the ACDV back from
6   Equable, Experian would have deleted the account and it
7   would have applied that soft delete.
8       Q.  The D you're referring to is the D that's in
9   the parenthetical, big capital D, and then after it, it
10  has, Equable Ascent sued me for this debt in Jefferson
11  County, Alabama, and I won?
12      A.  Yes, sir.
13          (Exhibit Number 6 was marked)
14      Q.  Let me show you what's marked Exhibit 6 and ask
15  you to identify that, please.
16      A.  Sure.  This is the investigation results
17  prepared for Mr. Collins, generated on September 9th,
18  2010, with report number 2252-3310-67.
19      Q.  Okay.  And this report was generated as a
20  result of what?
21      A.  As a result of Mr. Collins contacting Experian,
22  disputing the Equable Ascent Financial.
23      Q.  Okay.  And prior to Experian issuing this
24  report, Exhibit 6, what did they do for purposes of
25  completing their investigation?

Page 94

1       A.  I'm sorry.  I didn't understand your question.
2       Q.  Prior to issuing this report, what did Experian
3   do in the way of investigating?
4       A.  What Experian does is start the reinvestigation
5   process, and part of that process would be contacting
6   the source of the information.  So looking at Exhibit 5,
7   Experian sent an ACDV to Equable and asked them to
8   verify all information regarding that particular
9   account, as well as the status and the ownership
10  encompassing that particular dispute as well.
11      Q.  Okay.  And what information did Experian
12  receive from Equable prior to the date of Exhibit 6?
13      A.  It would be the information on Exhibit 5, on
14  the response.  9/9/2010, it would be that data within
15  that response.
16      Q.  Okay.  And you're talking about where it says,
17  Response Date?
18      A.  Yes, sir.
19      Q.  Okay.  So what -- by looking at this, what
20  information is this showing that Experian received from
21  Equable?
22      A.  It is showing some update information.  It is
23  showing, it looks like, some balance information, past
24  due information being updated, 2,318, it looks like some
25  other dates of 9/9/2010 as a payment level date, a

Page 95

1   delinquency date of 3/13/2009, collection account 93 and
2   type 48 was requesting the change as well.
3       Q.  Okay.  So when Experian sent Exhibit 6, the
4   information that Equable had provided to them, had
5   Equable confirmed what the consumer was saying?
6       A.  As far as what Equable does on their side, I
7   just would not have knowledge of that.  What I can tell
8   you is, based on the information Experian received
9   through the ACDV process, they did verify the
10  information to be reported accurately as of 9/9/2010 and
11  requested certain information to be updated as well.
12      Q.  Okay.  Point out to me, if you will, on
13  Exhibit 5 how you -- where it's showing on here that
14  Equable is confirming what the consumer has disputed.
15      A.  As far as the code that's used, it would be on
16  an ACDV itself.  What I can tell you based off of this
17  information, that Equable does participate in the
18  dispute process per their subscriber agreement.  And
19  being on the response side, it would be on the ACDV
20  where it would show the information that they are
21  verifying to Experian.  This just shows the printout for
22  the system, Exhibit 5.
23      Q.  Okay.  So --
24          MR. HANTHORN:  And I object.  Dave, make
25  sure you guys are using the term verify the same way

Page 96

1   because your question indicated that you might not be.
2   And, again, I'll let the witness testify, but I think
3   you may be about to sail past each other.
4       Q.  (BY MR. SELBY)  Is there -- the information on
5   Exhibit 5, is there anything, by looking at Exhibit 5,
6   that you can determine what Equable's position as it
7   relates to Mr. Collins' dispute?
8       A.  Based on the -- like I said, the ACDV itself,
9   it does have more information about specific codes that
10  they told for Experian.  But generally looking at
11  Exhibit 5, what I can tell you is they're stating to
12  Experian to keep the data, not delete it, and update
13  certain other data elements.
14      Q.  Okay.  So when Experian got this -- had this
15  where Equable is telling Experian to keep the data and
16  not delete it, what then did Experian do?
17      A.  Based on the information, again, that would be
18  on the ACDV, Experian goes through a process where we're
19  looking to see if the information matches.  So we --
20  since we have a situation where we're asking them to
21  check all ID, we're looking at that information as well
22  and then -- as well as the response itself.  Once the
23  information matches, then we will go ahead and make the
24  update.
25      Q.  Okay.  When you say the information matches and

24 (Pages 93 to 96)

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 97

1    you'll go ahead and make the update, what information is
2    matching?
3        A.  It would be on the ACDV.  It would be the name
4    information, whatever they have within their records
5    that they're telling Experian is accurate.
6        Q.  But not the dispute information?  Just the
7    name/ID information; is that what you're saying?
8        A.  We look at all the information, but also the --
9    since this was also an ownership type, we also look at
10   the ID in order to keep the data.
11       Q.  Okay.  Did Experian at any time attempt to
12   verify what the consumer was telling them, outside of
13   asking for the information from Equable?
14       A.  When you say "verify," my understanding is
15   Experian's position was to start the reinvestigation
16   process.  Outside of having anything to use to make an
17   independent decision, Equable is the company that's
18   reported the information to Experian, so that's the
19   place that would have more knowledge about that account;
20   and that's the source that Experian used in this case.
21       Q.  Well, the consumer would also have knowledge
22   about his own account, correct?
23       A.  According to the letter, yes, we did get
24   information about that account.
25       Q.  Okay.  And what did -- Equable is saying not to

Page 98

1    delete the account.  The consumer is saying to delete
2    it.  Did Experian do anything, outside of just asking
3    Equable whether they agreed or not?
4        A.  Experian did not receive any kind of
5    documentation they can use independently, so it did rely
6    on the source of the information to verify.
7        Q.  Other than -- and when you say "the source,"
8    you're meaning Equable, correct?
9        A.  Yes, sir.
10       Q.  Okay.  Other than the source of the
11   information, Experian does not go outside of the source
12   to verify information on a consumer dispute?
13       A.  There are times when Experian does use
14   documents that are sent.  Beyond that, if nothing is
15   sent, then we do ask the company that's reporting the
16   information to verify their own records.
17       Q.  Okay.  Let me maybe ask it a different way.
18   Does Experian -- would Experian -- for instance, in this
19   situation, would Experian, on their own, investigate
20   whether or not -- call the court, obtain copies of the
21   judgment to find out whether Equable's correct or
22   Mr. Collins is correct?  Would they do that on their
23   own?
24       A.  It would depend on what's received.  Each and
25   every time would be different.  This particular time,

Page 99

1    there is no extra documents to use to make any phone
2    calls to a court, to do anything of that nature.  There
3    was no documents to use, independent of contacting the
4    reporting source.  So Experian contacted the company
5    that has knowledge about that particular account
6    themselves since they're reporting it to Experian.
7    Outside of that, Experian did not contact anybody else.
8        Q.  Well, Mr. Collins provided the information to
9    contact the court, didn't he, to Experian?
10           MR. HANTHORN:  You're holding on to
11   Exhibit 4 where he does not, but I think maybe you meant
12   to point to Exhibit 2.  But it's up to you, Dave.  But
13   the one you're touching doesn't --
14           MR. PHILLIPS:  Well, actually, he does
15   provide it in Exhibit 4.  It gives the information of
16   the case number and the account number to call the
17   court.  It doesn't have the actual phone number --
18           MR. HANTHORN:  Okay.
19           MR. McCARTHY:  -- but it does give
20   information.
21           MR. HANTHORN:  My mistake, David.  I
22   thought you were trying to point to the phone number.
23       Q.  (BY MR. SELBY)  Mr. Collins provided the
24   information to Experian of where they could verify what
25   he was saying, correct?

Page 100

1        A.  Can I look at Exhibit 4?
2        Q.  And 2.
3        A.  Okay.  Within Exhibit 4, Mr. Collins does state
4    the name of the account, the account number and the
5    reason for the dispute.
6        Q.  Did Experian take any of the information that's
7    in Exhibit 2 or Exhibit 4 and contact anybody other than
8    Equable?
9        A.  Exhibit 2 would be what Experian believed to be
10   a third party.  There was nobody reading that document
11   to be contacting Equable.
12       Q.  Well, wait.  Wait.  Let me stop you there.
13   That's at the time -- I mean, once they got Exhibit 4,
14   okay -- I mean, they don't just -- you don't do away
15   with Exhibit 2, do you?
16       A.  I'm not sure what you mean by "do away."
17       Q.  Well, I mean, Exhibit 2 is in your file,
18   correct?
19       A.  They're -- it's not kept in a manilla file.
20   It's kept within Experian's records.
21       Q.  Okay.  Let me make sure I understand.  So
22   you're saying you get --
23           MR. SELBY:  Pardon me.  Let me reach and
24   make sure I got it right.
25           MR. HANTHORN:  Yeah.

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 101

1    Q.  (BY MR. SELBY)  You get Exhibit 4.  Okay?  And
2  that's in response to Experian asking for him to verify
3  who he is, correct?
4    A.  Again, I don't know if that's what triggered
5  it, but this is what was sent.  Exhibit 4 was sent after
6  Exhibit 3.
7    Q.  Okay.  Exhibit 4 was sent after Exhibit 3,
8  correct?
9    A.  Yes, sir.
10   Q.  Okay.  And then once Experian got Exhibit 4,
11  was it -- Experian at that time now knows that it is
12  Curtis Collins, correct?
13   A.  In this particular contact, we believe it to be
14  Mr. Collins, yes.
15   Q.  Okay.  So he's disputing this particular trade
16  line, correct, with Equable Ascent?
17   A.  Yes, sir.
18   Q.  Okay.  And in Exhibit 4, he provides
19  information about the court judgment, correct?
20   A.  Yes, sir.
21   Q.  Okay.  He also provided information in
22  Exhibit 2; did he not?
23      MR. PHILLIPS:  Same letter.
24   A.  At the time that Experian received Exhibit 2 --
25  and these are looked at independently -- there is no

Page 102

1  reference in this Exhibit 4 to go look for any other
2  contacts.  They're -- the agent's looking at them
3  independently.  There's not a system file for all --
4    Q.  (BY MR. SELBY)  Okay.
5    A.  -- of the disputes that --
6    Q.  Okay.
7    A.  -- Experian receives.
8    Q.  So Experian -- I mean, the system and your
9  procedure, once you get Exhibit 4 and it's verified,
10  there's -- the agent doesn't go back and look at what
11  information was provided by the consumer prior to that?
12   A.  Only if the consumer is stating, I previously
13  provided something or even knowledge of that.
14   Q.  Okay.
15   A.  We would not know --
16   Q.  Okay.  Well, is Exhibit 2 in the file, in the
17  consumer's file?
18   A.  There's not a consumer file within the system.
19  All --
20   Q.  Is Exhibit 2 in the system?
21   A.  Yes.
22   Q.  Okay.  And the agent that's looking at Exhibit
23  4 can pull up on the system Exhibit 2?
24   A.  It's housed within Experian's records and it's
25  housed within the same system that Exhibit 4 would work

Page 103

1  out of.  However, at the time that these are processed,
2  it's on an individual basis.  So there's -- the person
3  that's working Exhibit 4 is not looking at Exhibit 2.
4      There are times when we do receive
5  something where a consumer says, Hey, I sent something
6  in.  Can you take a look at that, and it will give us a
7  reason to go back.  Outside of that, we're believing
8  this is all the information that's being disputed at
9  that time.
10   Q.  So let's assume that a consumer sends in
11  Exhibit 4 asking for more information and they say, Hey,
12  here's my driver's license, here's my Social Security
13  card, everything you're asking for on my ID, and
14  Experian determines -- and that's all they provide.  And
15  they say, Here's all the information you've asked for,
16  ID information, but they don't say anything in there
17  about the dispute, other than referencing the fact that
18  they've disputed prior.
19      MR. HANTHORN:  Do you have the
20  hypothetical he's giving you in mind?
21   Q.  (BY MR. SELBY)  In other words --
22      MR. PHILLIPS:  It's the one she just gave
23  him.
24      MR. SELBY:  Yeah.
25   Q.  (BY MR. SELBY)  You get Exhibit 4, okay, and it

Page 104

1  doesn't have anything in here other than, Hey, enclosed
2  is my driver's license, my Social Security card, all the
3  ID information Experian is saying you don't have to
4  verify me, and he adds -- that consumer adds in there,
5  By the way, for purposes of this dispute, see my prior
6  letter.  Is that agent going to have the ability to look
7  at the prior letter?
8    A.  Yes.
9    Q.  And they would in that instance?
10   A.  If there was a particular -- if the consumer
11  stated that, I've previously sent something; take a look
12  at that.  We'd need direction from the consumer.
13  Otherwise, we'd believe that everything within that
14  particular document is what's being disputed at that
15  time.
16   Q.  Okay.  So Experian has to have direction from
17  the consumer in that document before Experian will look
18  at their other documents?
19   A.  The Experian agent just would not have any
20  knowledge of any other contacts, so the Experian agent
21  is reading what's sent at that time.
22   Q.  Well, the Experian agent is going to know that
23  Exhibit 3 was sent, aren't they?
24   A.  Exhibit 3?
25      MR. HANTHORN:  Here's Exhibit -- yeah.

26 (Pages 101 to 104)

Page 105

1    Q.  (BY MR. SELBY)  Yeah.
2           MR. HANTHORN:  And you mean the agent
3    who's looking at 4 or do you mean 3 at the time 3 is
4    sent?
5           MR. SELBY:  I mean the agent looking at
6    Exhibit 4.
7    A.  The agent who's looking at Exhibit 4 would not
8    readily see this kind of information.  It's kept within
9    the disclosure log.  Similar to the D/R log, it's kind
10   of what goes with it.  So this being generated -- the
11   August 9th, 2010 Exhibit 3 being generated would be on a
12   disclosure log where all the ID is kept.  How the agent
13   works the file, looking into the file itself would not
14   readily look at that kind of information.
15   Q.  (BY MR. SELBY)  Why not?
16   A.  Because a consumer -- because the agent is
17   actually in the file itself looking for the accounts
18   being disputed.
19   Q.  I thought you said there wasn't a file.
20   A.  Okay.  And I -- when I say "file," I mean
21   something similar to if you're looking at an admin
22   report.  On the admin report, it's going to house what
23   that file, which -- disclosure -- the information that's
24   on the disclosure would look like at that time.  Paper
25   mail, how that's sent in, is not kept in the same kind

Page 106

1    of system.
2    Q.  Well, what you're referring to is that file,
3    which you just described.  Exhibit 2 is not in there?
4    A.  Exhibit 2 would be in Experian's imaging
5    system.
6    Q.  But the person who's looking at Exhibit 4, you
7    would agree with me, has no way of knowing about
8    Exhibit 2?
9    A.  No, sir.
10   Q.  And that's not just limited to Mr. Collins, is
11   it?  I mean, that's the way the system is set up?  That
12   wasn't for just Mr. Collins' file?
13          MR. HANTHORN:  Understanding, again, that
14   since you're now going beyond Mr. Collins, there's a
15   different witness who has been designated as to that.
16   But you may answer.
17   A.  As far as what's being viewed at the moment
18   that Experian receives that piece of mail, we're reading
19   the piece of mail and they also have our system where
20   we're processing the disputes.  They're two different
21   systems.  So the agent is looking for what's being
22   disputed, but this is housed separately.  It's housed in
23   a different kind of imaging system.  And each document,
24   each letter is looked at individually.
25   Q.  (BY MR. SELBY)  And is that the way it works as

Page 107

1    a whole or is that just what happened in just
2    Mr. Collins' case?
3           MR. HANTHORN:  Same objection.  You may
4    answer.
5    A.  That's just how -- how the dispute process as
6    far as how we're receiving mail and process a piece of
7    mail.
8    Q.  (BY MR. SELBY)  That's just how Experian's
9    dispute process works?
10          MR. HANTHORN:  Same objection.  You may
11   answer.
12   A.  Yes, sir.
13   Q.  (BY MR. SELBY)  This report, Exhibit 6, is the
14   result of Experian's reinvestigation, correct?
15   A.  Yes.  The reinvestigation for Equable.
16   Q.  Okay.  And the results of that reinvestigation
17   are under the heading Results?
18   A.  Yes.
19   Q.  Okay.  And then above that it's got, How to
20   read your results, correct?
21   A.  Yes, sir.
22   Q.  Okay.  And so when Mr. Collins or a consumer in
23   Mr. Collins' position gets this reinvestigation report,
24   it's telling him the result is what?
25   A.  It shows the outcome as reviewed.

Page 108

1    Q.  Okay.  So to know if -- when a consumer gets
2    this and he says, okay, the result of my dispute and
3    Experian's reinvestigation is reviewed, he's going to go
4    up and look at the definition for reviewed, correct?
5    A.  Yes.
6    Q.  Okay.  And it says that, This item was either
7    updated or deleted; review this report to learn its
8    outcome.
9        Okay.  Does this report state the outcome?
10   A.  Only the "Reviewed" is what's given.  It does
11   not have any other information.
12   Q.  Okay.  It doesn't tell the consumer whether it
13   was updated or deleted, does it?
14   A.  It only says "Reviewed" as the credit items are
15   listed.
16   Q.  Okay.  It doesn't say that -- it doesn't make
17   the consumer aware of whether or not the trade line was
18   deleted, correct?
19   A.  No.  It just says "Reviewed."
20   Q.  So looking at Exhibit 6, there's no way for
21   Mr. Collins to know whether the trade line that he
22   disputed had been deleted?
23   A.  There is an opportunity for consumers to view
24   the information online.  Right below the "Reviewed" is
25   the "Visit Experian.com/status" to check the status of

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 109

1    your pending disputes at any time.  So that is given, as
2    well as to the right we do have more information for a
3    consumer to request a full copy of the report itself as
4    well.  So that information is given as well.
5        Q.  Okay.  But on this report generated by
6    Experian, is there any way -- without going beyond
7    what's on the report for Mr. Collins or any consumer --
8    to know, if the outcome is reviewed, whether or not it
9    was updated or deleted?
10       A.  In this particular instance, no.
11       Q.  Okay.  And when you say "this particular
12   instance," I mean, Experian didn't just pick out
13   Mr. Collins, did they?  I mean, when it's got his report
14   on here and it says, Outcome reviewed, and it doesn't
15   tell him whether it was updated or deleted on the
16   report, did they do that just to Mr. Collins?
17       A.  Based on the information that I was able to
18   view as far as what was on the response from Equable,
19   just had not seen that kind of response before where the
20   type change itself was changed.  So whether or not it
21   was just Mr. Collins, it's possible.  I don't know that.
22       Q.  So it's possible that they did this just to
23   Mr. Collins on this report?
24       A.  Looking at Exhibit 5, we see that there is a
25   type change.  And a type of an account is given to

Page 110

1    Experian at the time that the information is loaded into
2    Experian's database.  So very important information like
3    the name of the account, the account number, information
4    about that particular account typically does not change.
5            So when we have a situation where
6    Exhibit 5 shows the type 48 being changed from factoring
7    company, then it just seems to be some sort of glitch of
8    some sort to not populate the results on the other side.
9        Q.  In your position that you hold now, have you
10   made a determination of whether or not this glitch was
11   isolated just to Mr. Collins?
12       A.  I had never seen that type of response before.
13       Q.  But have you made an investigation to determine
14   whether or not this glitch was limited to Mr. Collins?
15       A.  I'm not quite sure what you mean, sir.
16       Q.  Okay.  I'm using your words.  You said it was a
17   glitch, right?
18       A.  And I'm not a system expert, so that's how I
19   understand it to be.
20       Q.  Okay.  Have you determined whether or not this
21   glitch was done just to Mr. Collins or did it happen to
22   other consumers?
23       A.  I just have never seen it before, so I -- there
24   was no independent --
25       Q.  Well, I know you've never seen it before.  I

Page 111

1    haven't seen it before either.  But I'm asking:  Did you
2    do anything to determine whether it has happened to
3    other people before?
4        A.  No, sir.
5        Q.  Okay.  Now --
6            MR. HANTHORN:  Which one are you looking
7    at?  I'm sorry.  What exhibit is that?
8            MR. SELBY:  Exhibit 6.
9            MR. HANTHORN:  Thank you.
10       Q.  (BY MR. SELBY)  On Exhibit 6, How to read your
11   results, and it's got Deleted, Remains, Updated and
12   Reviewed, this is a form investigation results report,
13   correct?
14       A.  Yes.  This would be sent at the end of the
15   reinvestigation process for the investigation results.
16       Q.  Okay.  And on each consumer's results, it's
17   going to say -- under Outcome, it's either going to say
18   one of those four things, correct?
19       A.  Yes, sir.
20       Q.  Okay.  And are those four categories still used
21   by Experian today, the Deleted, Remains, Updated,
22   Reviewed?
23       A.  Yes, sir.
24       Q.  Okay.  And were they being used prior to the
25   time Mr. Collins received this report?

Page 112

1        A.  Yes, sir.
2        Q.  From your -- based on your personal knowledge
3    since the time you've been at Experian, have those same
4    four categories been used on reinvestigation reports?
5        A.  I believe so.  But if it was ever changed, I
6    just wouldn't remember that kind of information.
7        Q.  Okay.  And when you were talking about the
8    glitch on Mr. Collins, what is it that was the glitch?
9        A.  According to what I'm able to view when looking
10   at Exhibit 5, minus the ACDV -- I don't have that in
11   front of me today -- I do see the type change of 48; and
12   that's a very important piece of information in order to
13   populate the account to be displayable to the consumer
14   as far as the results.  So looking at just that type
15   change, it appears to be some sort of glitch that did
16   not trigger the population of the results on page 2.
17           MR. HANTHORN:  Page 2 of Exhibit 6?
18           MR. SELBY:  Right.
19       Q.  (BY MR. SELBY)  So the -- if you look at
20   Exhibit 5 -- I tell you what.  Let's do this.  Just put
21   an orange highlight where you're talking about the
22   glitch was.
23       A.  (Witness complies)
24       Q.  Okay.  And you've highlighted where it says,
25   Type 48?

28  (Pages 109 to 112)

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 113

1    A.  Yes, sir.
2    Q.  Okay.  When you say "didn't populate," what
3  does 48 mean for type?
4    A.  Collection account.
5    Q.  Okay.  So putting that in there, putting 48 in
6  there, is that the glitch, that somebody put the 48 in
7  there wrong?  I don't know that I follow.  Explain to me
8  more what the -- I don't understand what kept this from,
9  so to speak, populating.
10   A.  As far as the response from Equable, typically
11  what we would see is all the other data elements being
12  changed.  We would have balance information changing,
13  things of that nature.
14        Equable told Experian to change from
15  factoring company to type 48.  So those are two
16  completely different types of accounts.  So that's the
17  big change that happened on the response side, and that
18  was given by Equable on 9/9/2010.
19   Q.  But -- okay.  But the type 48 here would have
20  nothing to do with putting the outcome as being
21  reviewed?
22   A.  I don't know what the system looks at as far as
23  what triggers a review.  I do know that this is not
24  typical, that type of type change.
25   Q.  Okay.  Is this report, Exhibit 6, in the form

Page 114

1  that it's sitting here right now, typical?
2    A.  No, sir.  You would typically see, on the other
3  side on Exhibit 6, the actual change itself.
4    Q.  Okay.  On page 2 of 2 --
5    A.  Yes, sir.
6    Q.  -- where it says, This page intentionally left
7  blank?
8    A.  Yes, sir.
9    Q.  Okay.  And so where it's got Reviewed and then
10  the consumer goes up here and reads Updated or Deleted,
11  Review this report to learn its outcome, you're saying
12  the "Review this report to learn its outcome" is what
13  should be on page 2?
14   A.  Yes, sir.
15   Q.  Okay.  And you're saying that the reason that
16  what should have been on page 2 was left off is why?  Or
17  do you know?
18   A.  According to the information I'm able to view,
19  Equable gave Experian a change that we typically would
20  not see in an ACDV response itself.  So we have a type
21  changing of 48.  Based on that information, it appears
22  there was some sort of glitch where it did not populate
23  the actual changes that we can see here in Exhibit 5
24  from displaying on the investigation results.
25   Q.  Okay.  Have you gone to anybody at Experian, I

Page 115

1  guess, from the standpoint of IT or whoever it may be
2  and said, Hey, I was looking at this, what is Exhibit 6,
3  and it appears to me that something got left off.  Can
4  you explain to me what could have happened?
5        MR. HANTHORN:  I will object at this
6  point.  There was an investigation that the witness was
7  on a phone call of, but that was my investigation and
8  Sean's investigation.  She did not initiate it.  She's
9  aware of it.  And I would instruct her not to answer
10  based upon work product.
11       THE WITNESS:  Can I go to the restroom?
12       MR. SELBY:  Yeah.  Let's take a break.
13       (Recess from 12:21 to 12:37)
14   Q.  (BY MR. SELBY)  This glitch that you
15  referenced, when did you discover that?
16   A.  Any kind of research would be at direction of
17  counsel.
18       MR. HANTHORN:  Okay.  Let me interject --
19  thank you for -- and I'm sorry, I should have jumped in
20  quicker.
21       Discovering the type thing she obviously
22  noticed at the time, but noticing that that had
23  something to do with what --
24       MR. SELBY:  Well, she had said that.
25       MR. HANTHORN:  I'm sorry.  Then I

Page 116

1  apologize.  But having -- recognizing and making the
2  connection that that had anything to do with not
3  populating, that was entirely things that she was not
4  doing, but that she was providing input to me on that I
5  was going ahead and finding out through others in
6  systems.
7        MR. SELBY:  Okay.  Let me just make sure I
8  understand.
9        MR. HANTHORN:  Sure.
10       MR. SELBY:  So in a trial of this case,
11  what I don't want to happen is that --
12       MR. HANTHORN:  She's not going to come in
13  and testify that that -- she's not going to suddenly
14  turn into the systems witness.
15       MR. SELBY:  No, I understand that.
16       MR. HANTHORN:  Okay.
17       MR. SELBY:  But is it Experian's position
18  that -- well, let me just ask her because something you
19  said --
20       MR. HANTHORN:  That's fair.
21       MR. SELBY:  -- may answer it.
22   Q.  (BY MR. SELBY)  When did you learn of it?
23       MR. HANTHORN:  The glitch?
24       MR. SELBY:  Yeah.
25   Q.  (BY MR. SELBY)  When did you learn of the

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 117

1   glitch?
2       A.  It was during a phone call with counsel.  I
3   don't remember the exact time or date.
4       Q.  Okay.  And --
5       MR. HANTHORN:  If it helps, Dave, it was
6   well after the lawsuit was filed.
7       THE WITNESS:  Yes.
8       Q.  (BY MR. SELBY)  And explain to me again,
9   because I just -- I just don't understand the -- kind of
10  take me through the steps of what the glitch is and why
11  the glitch has anything to do with what's not on the
12  report.
13      A.  I'm sorry.  Was that a specific question?
14      Q.  Yes.
15      A.  I'm sorry.  I didn't hear that whole thing.
16      Q.  First of all, explain to me, what is the
17  glitch?  What are you -- what are you referring to as a
18  glitch?
19      A.  And since I'm not a systems expert person, my
20  own knowledge as far as what I'm able to view, a type
21  change is a very important key change within what's
22  being reported to Experian.  We typically would not have
23  this kind of a change coming back on an ACDV response.
24  When they first -- when Equable first gave the
25  information to Experian, they said they were a factoring

Page 118

1   company and that's how the information was given to
2   Experian.  On the response side, changing the type 48
3   just triggered a glitch to where the response that we
4   have in Exhibit 5 did not display on page 2 of
5   Exhibit 6.
6       Q.  Is that -- is the glitch because 48 was
7   entered?
8       A.  I don't know if that's the -- if it was just
9   because it's 48, but I do know it to be a very important
10  key change of that type of account.
11      MR. HANTHORN:  If it helps, David, if it
12  had been 48 before and remained 48, it's my
13  understanding there would not have been a glitch.  It's
14  the change in the type that is significant.  It was that
15  it had been reporting as a factoring company and was now
16  reporting as a debt collection.  And the same thing I
17  understand would have happened had it been backwards, if
18  it had originally been reported as a 48 and then changed
19  to whatever the code is for factoring.
20      MR. SELBY:  So once that change is made is
21  what produces the problem in the report?
22      MR. HANTHORN:  In the populating on
23  Exhibit 6.
24      MR. SELBY:  Exhibit 6?
25      MR. HANTHORN:  Yes, sir.

Page 119

1       Q.  (BY MR. SELBY)  And do you know whether or
2   not -- is that something that's now been fixed?
3       MR. HANTHORN:  You're asking her about a
4   subsequent remedial measure.  With the understanding
5   that it's a subsequent remedial measure, I will tell you
6   that now, were this to happen tomorrow or today, a full
7   report would print anytime "Reviewed" was what came up.
8   So the same glitch would not occur today.
9       MR. SELBY:  Got you.
10      MR. HANTHORN:  And that's way more than I
11  know at a system level.  But instead of -- now, anytime
12  it's going to report "Reviewed," it's not going to try
13  to match up with the same account type.  It's going to
14  print the full consumer disclosure, which would,
15  therefore, include that.
16      Q.  (BY MR. SELBY)  The report as it appears right
17  now, Exhibit 6, does it violate FCRA?
18      MR. HANTHORN:  Objection to the extent
19  you're calling for a legal conclusion.
20      A.  I don't know what would be stipulated in the
21  FCRA.  I'm not an attorney.  My understanding would
22  be -- to give the outcome beyond that, I just wouldn't
23  know.  I'm not an attorney.
24      Q.  (BY MR. SELBY)  You don't have an opinion or
25  position on that?

Page 120

1       MR. HANTHORN:  On the application of the
2   law?  You may answer.
3       A.  I don't know the law to give an application.
4   What I do know is policies and procedures Experian has.
5       Q.  (BY MR. SELBY)  Okay.
6       MR. SELBY:  Greg, just so I'm clear
7   here --
8       MR. HANTHORN:  Sure.
9       MR. SELBY:  -- the next person is a
10  systems person, but is there a --
11      MR. HANTHORN:  She's not the computer
12  systems person, no.
13      MR. SELBY:  Is there a 30(b) person that's
14  going to testify as to Experian's positions in their
15  answer?
16      MR. HANTHORN:  There is not a 30(b) person
17  who is going to testify as to the application of law.
18  There are 30(b) witnesses, including this one and
19  including the next one, who are going to testify as to
20  the procedures, etcetera.  But, no, we don't -- we did
21  not designate an attorney.
22      MR. SELBY:  I'm not -- I'm not asking
23  that.  I'm just -- if Experian's position at trial is
24  going to be that this report does not violate the FCRA,
25  then --

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 121

1    MR. HANTHORN:  Well, I'll tell you that
2  this is going to be Experian's position at trial based
3  on, among other things, what this witness has already
4  testified to about the two other ways that the results
5  can be found based upon this.  There's no hiding the
6  ball on that.  But this witness doesn't have to say, And
7  that's why it does not violate the FCRA.  She's given
8  the factual predicate.
9    MR. SELBY:  No.  I understand --
10    MR. HANTHORN:  Okay.
11    MR. SELBY:  -- clearly what your position
12  is.  But what I'm asking, though, is:  So there is not
13  going to be a witness on behalf of Experian to give an
14  opinion as to whether or not their report violates the
15  FCRA?
16    MR. HANTHORN:  There is not going to be a
17  witness under the terms of the protective order or the
18  30(b)(6) to come in here and testify as to the
19  application of law to fact and do what an attorney does.
20  That is correct.
21    MR. SELBY:  So, no?
22    MR. HANTHORN:  With the qualifiers that I
23  added, you are correct.
24    Q.  (BY MR. SELBY)  Okay.  Going back real quick,
25  Experian on -- and I'm limiting this to Mr. Collins.

Page 122

1  Okay?  Experian did not -- other than making contact
2  with Equable, Experian did not do anything externally to
3  verify the information that Mr. Collins provided?
4    A.  And I believe I understand your question.  What
5  Experian did was contact Equable.  Outside of that,
6  Experian did not receive any kind of documents until
7  post-litigation to make any kind of independent change
8  or delete of the account.
9    Q.  I understand that.  But alls I'm asking is:
10  Did Experian do anything -- not what they received, but
11  did Experian themselves do anything other than
12  contacting Equable to verify what Mr. Collins was
13  telling them?
14    A.  Independent of the reinvestigation process, no,
15  sir.
16    Q.  Okay.  Well, then in the reinvestigation
17  process, did they do anything other than contacting
18  Equable?
19    A.  Experian did, within the reinvestigation
20  results, state more information to the consumer.  The
21  consumer can request, per the FCRA, a request of the
22  description.  They can add a statement.  So Experian is
23  advising the consumer of their rights within this
24  document as well.
25    Q.  Okay.  Let me ask my question -- that's not

Page 123

1  what I'm asking.
2    MR. HANTHORN:  Actually, it was kind of
3  responsive.  Even Deposition Exhibit 6 is giving
4  information.  But go ahead.
5    MR. PHILLIPS:  That's not what he asked
6  her, though.
7    MR. HANTHORN:  Well, it was.
8    MR. PHILLIPS:  He asked her a direct
9  question and she's not answering it.
10    MR. HANTHORN:  Well, I'm sorry you don't
11  think so.
12    Q.  (BY MR. SELBY)  Did Experian do anything in
13  part of their reinvestigation other than contacting
14  Equable?  And if the answer is yes, tell me what.  If
15  the answer is no, that's fine.
16    A.  There's a lot of things that Experian does and
17  not just to contact --
18    Q.  In this case, did they do anything with
19  Mr. Collins in the reinvestigation other than contacting
20  Equable?
21    MR. PHILLIPS:  Yes or no.
22    Q.  (BY MR. SELBY)  Yes or no.
23    MR. HANTHORN:  Wesley, please don't double
24  team me.  You don't need to do that.
25    MR. PHILLIPS:  I'm not.

Page 124

1    MR. HANTHORN:  He's doing fine.
2    MR. PHILLIPS:  I'm helping my colleague.
3    MR. HANTHORN:  You're telling your
4  client -- your colleague that they need to ask yes or
5  no.
6    A.  And when we talk about what Experian did,
7  Experian doesn't just generate the ACDV.  Experian has
8  procedures once they receive the ACDV and, as well,
9  convey the results to the consumer.  So it's not just
10  contacting a company.  Experian has also additional
11  steps once we receive the information in order to keep
12  the data.
13    Q.  (BY MR. SELBY)  Who does the ACDV go to?
14    A.  Equable, in this case.
15    Q.  Okay.  Other than sending the ACDV to Equable,
16  what else did Experian do to investigate Mr. Collins'
17  claim?
18    A.  It would be Experian's position to start the
19  investigation process.  So once Experian received the
20  results back from Equable, Experian matched up the name
21  information and made the requesting updates.  They also
22  sent Mr. Collins the investigation results.
23    Q.  What did they do in the investigation part?  I
24  know they sent him results.  Okay.  We know you
25  contacted Equable.  Other than contacting Equable

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 125

1 through the ACDV, what did Experian do to verify whether
2 or not what Mr. Collins was telling them was correct,
3 other than the ACDV?
4     A.   As far as the obligation of Experian, it would
5 be to start the reinvestigation process.  Outside of
6 actually getting a document -- for example, Exhibit 1 --
7 of getting a document where Experian can make that
8 independent determination, we are contacting the company
9 that has more information about the account itself.  So
10 we do contact the reporting source and ask them to check
11 all their records.  So whatever's being checked or
12 verified would be on the Equable side.  And we ask that
13 Equable report back and tell us what they have within
14 their records, verify if it's accurate, telling us to
15 change it or telling us to delete it.
16     Q.   Okay.  Mr. Collins is telling y'all what
17 Equable -- information Equable has is incorrect, right?
18 That's what he's disputed?
19     A.   Yes.
20     Q.   Okay.  So now you're asking Equable whether or
21 not that information is correct, right?
22     A.   Yes.  We started the process.  We're asking
23 them to check all information and included that
24 information in the ACDV.
25     Q.   Okay.  And Mr. Equable (sic) is making Experian

Page 126

1 aware of a court judgment in his favor against Equable,
2 correct?
3            MR. HANTHORN:  You mean Mr. Collins,
4 perhaps?
5            MR. SELBY:  Mr. Collins.
6     A.   Mr. Collins did tell Experian that, and that's
7 what Experian conveyed to Equable.
8     Q.   (BY MR. SELBY)  Okay.  And did Experian --
9 other than conveying exactly what Mr. Collins had told
10 them, did they do anything such as contact the court?
11     A.   Experian did not contact the court, no.
12     Q.   Okay.  Did they look on any kind of court
13 database to determine whether or not there was, in fact,
14 a judgment, as he had pointed out?
15     A.   No, sir.
16     Q.   Okay.  Did they do any external investigation
17 whatsoever, other than the ACDV information?
18     A.   When we talk about external, it's -- Experian's
19 term is external when we are sending the ACDV.  In
20 looking at Exhibit 5, if you're going to use the term
21 external, we have a dispute reason that's generated here
22 that says external.  So when you're talking about
23 external, it's being outside of Experian.  So that's my
24 understanding of the term.
25     Q.   Okay.  Then we won't use that term.

Page 127

1            What I've been saying, other than
2 contacting Equable, was there any investigation done?
3     A.   And when you say "investigation," the
4 reinvestigation is what Experian does.  And once we
5 receive the response back from the creditor, we also
6 make sure that the information matches up.  So not only
7 sending the ACDV, but also receiving it and conveying
8 the results to the consumers is -- that's the entire
9 ACDV process or the reinvestigation process.
10     Q.   Okay.  And the ACDV reinvestigation process,
11 did Equable do anything other than -- did
12 Experian do anything other than contacting Equable?
13     A.   No.  There was no independent --
14     Q.   Okay.  Thank you.
15     A.   -- documents.
16            MR. PHILLIPS:  Greg, did y'all find for us
17 a copy of the ACDV?
18            MR. HANTHORN:  Yes.
19            MR. PHILLIPS:  Do you know what Bates
20 number that is?
21            MR. SELBY:  We couldn't find it.
22            MR. PHILLIPS:  Because we thought it
23 was -- we may be thinking it's the UDF.
24            MR. McCARTHY:  Well, it's -- off the top
25 of my head, it's 2257, 58-ish.

Page 128

1            MR. PHILLIPS:  We may be thinking it's the
2 UDF when it's actually the ACDV.
3            MR. HANTHORN:  Do you want us to take a
4 break and go see if we can find a copy for you?
5            MR. PHILLIPS:  Do you want to, David?
6 It's up to you.
7            MR. SELBY:  Yeah.  If we've got it, yeah.
8            MR. HANTHORN:  It's been produced.
9            MR. PHILLIPS:  Because we were thinking it
10 had not been introduced.
11            MR. HANTHORN:  No.  It's been produced.
12            MR. McCARTHY:  It was even used in
13 Mr. Collins' depo.  I can go get that for you.
14            MR. PHILLIPS:  Yeah.  Can y'all get us a
15 copy of it?
16            MR. McCARTHY:  Let's take a break.
17            (Recess from 12:53 to 12:56)
18            MR. HANTHORN:  Okay.  If the record would
19 just reflect that, at counsel's request, we've gone
20 ahead and provided a copy printout of Defendant's
21 Exhibit 10 from the deposition of Curtis Collins with
22 Experian Bates Number 2258 as the ACDV response.
23            Can we mark this one just since we have
24 identified it and put it out here, Dave, whether you
25 want to ask questions about it or not?

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 129

1    MR. SELBY:  I'm not going to ask questions
2    on it.
3    MR. HANTHORN:  Do you mind if we mark it,
4    though, just so it reflects --
5    MR. SELBY:  That's up to you.
6    MR. HANTHORN:  I'd like to mark it.
7    (Exhibit Number 7 was marked)
8    MR. HANTHORN:  And you're telling me I can
9    put it aside, Dave?  You're not going to ask questions
10   about it, so I can put it aside?
11   MR. SELBY:  Yeah.  I'm not going to ask
12   questions about it.  An answer may lead to it, but I
13   don't have any intentions to.
14   MR. HANTHORN:  So next will be 8?
15   MR. SELBY:  Next will be 8.
16   (Exhibit Number 8 was marked)
17   Q.  (BY MR. SELBY) I'll simply ask you to identify
18   what that is.  And that's, unfortunately, not Bates
19   stamped, I don't think.
20   MR. HANTHORN:  It's not?
21   MR. SELBY:  The next one is.
22   MR. HANTHORN:  I'm sorry.  He actually was
23   talking to you, even though he was a little more silent
24   than he usually is.  So the question is:  Can you
25   identify Exhibit 8, correct?

Page 130

1    MR. SELBY:  Correct.
2    A.  Experian did not produce Exhibit 8, but I do
3    see Experian's logo and it appears to be something that
4    was printed from an Experian Web site regarding Curtis
5    Collins.
6    MR. HANTHORN:  And just to be clear,
7    produced in the sense of we didn't produce it to you in
8    response to a request for production of documents.  This
9    is something that Mr. Collins or perhaps his wife, if
10   I'm remembering --
11   MR. PHILLIPS:  Yeah.
12   MR. HANTHORN:  -- the deposition testimony
13   correctly, went on using that address and printed it
14   from their home computer.
15   MR. SELBY:  Okay.  That's not my -- I
16   mean, I'm not -- I didn't ask about all that.
17   MR. HANTHORN:  No, no, no.  I just --
18   MR. SELBY:  I just asked if she could
19   identify what it is.
20   MR. HANTHORN:  Sure.  That's fine.  It was
21   just the word "produced" that scared me.  I wanted to
22   make sure we weren't giving you the impression that you
23   thought we had not provided it.
24   A.  According to the document, it appears there is
25   two trade lines listed.  It does appear -- it has Curtis

Page 131

1    Collins' name to the left, Experian's logo to the right.
2    I'm just not familiar with the name on the top left and
3    that date.  I have not seen that kind of a format as
4    printed.  But this is what typically it would look like
5    if something was printed from the Internet.
6    Q.  (BY MR. SELBY) It is an Experian document,
7    just not one, as you both qualified, produced by
8    Experian?
9    A.  It appears to be, and that's what it shows to
10   be today.
11   Q.  Okay.  And other than that, you don't recognize
12   what it is?
13   A.  Just looking at the document, I see that
14   there's a freecreditreport.com log-in.  I believe that's
15   a reseller of Experian.  Beyond that, it's just not
16   something that I've seen in this exact format.  I've
17   seen reports where they have Experian, Equifax and
18   TransUnion.  And just Experian I've seen alone, but just
19   not in this particular -- I don't know if it's just new.
20   I just have not seen this particular format before,
21   meaning with Curtis Collins as the consumer's name in
22   the top left.  I just have not seen that kind of
23   printout with the consumer's name and "Report As Of."
24   (Exhibit Number 9 was marked.)
25   Q.  I'll ask you if you will identify what is

Page 132

1    Deposition Exhibit 9, which is Experian Bates stamp 37,
2    and I'll just ask you to identify what that's a page
3    from.
4    A.  This is page 5 of 6 of a -- I'm sorry, 5 of 16
5    of the report number 2252-3310-67.  It appears to be the
6    one that was generated on November 23rd, 2010.  And it's
7    just showing three accounts listed on a disclosure.
8    (Exhibit Number 10 was marked)
9    Q.  Okay.  I'll ask you to identify what is
10   Deposition Exhibit 10, which is Experian 2257.
11   A.  This is also an ACDV, but in a different
12   format.  This is something pulled directly from e-OSCAR,
13   similar to Exhibit 7.  It would have the same exact
14   information, just a different format.  And this was done
15   post-litigation.
16   Q.  Okay.  So this would not have been something
17   that was done as part of the reinvestigation process?
18   A.  It would be done at the direction of counsel
19   when Experian received the lawsuit.
20   Q.  But not done prior to the lawsuit?
21   MR. HANTHORN:  Make sure you're on the
22   same page, please.  He's -- you're talking about the
23   printing, right?
24   A.  As far as the action itself was at direction of
25   counsel.  Printing was also at -- post-litigation, at

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 133

1  the results of the -- the results back from Equable
2  asking to delete the account.
3      Q.  (BY MR. SELBY)  That was at directive of
4  counsel?
5      A.  Contacting Equable, yes.
6      Q.  And the deleting of the account was at
7  direction of counsel?
8      A.  I don't know why Equable requested the deletion
9  of the account.  That would be up to Equable, not
10 Experian.
11     Q.  No.  I'm talking about Experian's deletion of
12 the account.
13     A.  On the response back from Equable, "Response
14 Code 03, Delete Account," they're actually telling
15 Experian themselves to delete the account.
16     Q.  But Experian's decision to delete the account
17 within Experian's records, when was that decision?  Who
18 made that decision?  Was that at direction of counsel?
19     A.  It would just be the ACDV process itself.  Once
20 Experian received the delete, Experian will delete the
21 account.
22     Q.  Under Dispute Code 1, it says 040 and then it
23 says, Account involved in litigation.  Provide or
24 confirm complete ID and verify all account information.
25         Who fills that in?  Is that Experian or

Page 134

1  Equable?
2      A.  That's Experian.
3      Q.  Okay.  And the 040, is that a code for "Account
4  involved in litigation"?
5      A.  Yes, sir.
6      Q.  And when it refers to the account
7  involved in litigation, it's referring to the Equable
8  account, correct?
9      A.  I believe it could be either/or, either/or
10 account involved in litigation, meaning the consumer has
11 filed litigation against Experian or the fact that there
12 was litigation involved with that particular account
13 that's being disputed.  I believe it can be for
14 either/or.
15     Q.  Okay.  What is it in this case?
16     A.  It's just the code that was used at that time.
17 Mainly, it's asking for Equable to check -- to confirm
18 all ID and verify the account information.  Similar to
19 the one we had sent before, we're asking them not only
20 to check the status of the account information, as well
21 as the ID of the information that they had previously
22 reported to Experian.
23     Q.  What is it in this case, though, the 040,
24 Account involved in litigation?  Is that referring to
25 the Equable account or is it referring to the case by

Page 135

1  Mr. Collins against Experian?
2      A.  I did not actually trigger this particular ACDV
3  to be sent, but I do know that it can be used for
4  either/or.  It's just conveying the information about
5  litigation from the company that reported the
6  information to Experian.  Also noted, the "Equable
7  Ascent sued and lost in court" is also given within the
8  FCRA Relevant Information.
9      Q.  But by looking at this, you don't know whether
10 "Account involved in litigation" is referring to
11 either -- you don't know which one it's referring to?
12     A.  It doesn't have to refer to a particular
13 process or -- it's just conveying some information that
14 Experian received.  Beyond that, it's just a code that
15 can be chosen.  The additional relevant information
16 section includes more information about what was being
17 disputed.
18     Q.  Yeah.  All I'm asking is not what it has to be,
19 just simply is -- you said the "Account involved in
20 litigation" code 40 can either be referring to the
21 litigation involving Equable or it can be referring to
22 the litigation involving Experian.  In this situation,
23 which is it?
24     A.  It's --
25         MR. HANTHORN:  Or is it both?

Page 136

1      A.  Well, it could be both.  The agents are trained
2  to -- to use different codes for different reasons.
3  There are times when it could be multiple reasons.  But
4  in this particular situation, that's just what was
5  chosen by this agent.  And the process itself was for
6  them to check all ID.  Included in that is that
7  additional relevant information that explains it
8  further.  Beyond that, it's just going to be a dispute
9  code that's a possibility for the agents to choose.
10     Q.  (BY MR. SELBY)  So is this dispute code based
11 on -- where it says, FCRA Relevant Information, based on
12 what you're seeing here, does it appear that the
13 "Account involved in the litigation" is referring to
14 Equable case and not the Experian lawsuit?
15     A.  It would be the agent selecting the code first
16 and then adding the relevant information.  So the
17 relevant information does not trigger the code.  It's
18 just something that we can choose -- the dispute reason
19 we can choose in order to convey information to the
20 reporting source.
21     Q.  Based on the information that's here where it
22 says, FCRA Relevant Information, Equable Ascent sued and
23 lost in court, and then above it's got the dispute code
24 040, Account involved in litigation, based on looking at
25 that, would it be your determination that that account

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 137

1  involved in litigation is relating to the Equable
2  lawsuit.
3      A.  I'm not going to be able to guess what was the
4  reason for that particular choice, but I can tell you
5  that through the process where Experian is doing the --
6  doing the -- sending out the ACDVs, it's an opportunity
7  to convey information that the account was involved in
8  litigation.  It could be Experian; and if it was
9  Experian, possibly it would have more information about
10 Experian in the relevant information.  I don't know.
11 But this particular one does give more information about
12 Equable in the additional relevant information section.
13 So that information is conveyed as the reason behind the
14 dispute itself.
15     Q.  So you don't know?
16     A.  I'm sorry.  I don't know what?
17     Q.  Where the "Account involved in the litigation"
18 040 code is referring to the Equable lawsuit judgment or
19 the case against Experian.
20     A.  It's just a code that Experian can choose for
21 either/or.
22     Q.  Do you know which it is?
23     A.  It's just a code that is sent to Equable and it
24 just says, "Account involved in litigation."  The main
25 gist of the dispute itself would be the information

Page 138

1  typed in the relevant information section.
2      Q.  So the relevant information section is further
3  information about the 040 "Account involved in
4  litigation" code?
5      A.  That is correct.
6      Q.  If you go through it, it's got Account Status
7  and it's got 93, right below FCRA Relevant Information.
8      A.  Yes, sir.
9      Q.  What is that?  What's that code, 93?
10     A.  It's status for a collection account.
11     Q.  What does the 93 mean?
12     A.  Collection account.
13     Q.  That's all it means, just collection account?
14     A.  Each status will have a number that's
15 associated with it, and that particular status is -- or
16 that particular number is a collection account.
17     Q.  Okay.  And then you go across and all that
18 information -- Date Opened, Balance, Amount Past Due,
19 all the way across, Credit Limit, Original Charge-off
20 Amount -- that's all related to that account status; is
21 that right?
22     A.  Looking at Exhibit 10 in this kind of a format,
23 everything that -- a snapshot of what the account in
24 Experian's records would be housed in the first line.  I
25 don't know if you can see it, but it's the -- if you're

Page 139

1  looking at the "Date Opened, 9/25/2009," it's going to
2  be a snapshot of what that account looked like at that
3  moment.  Below would be if the creditor is making any
4  kind of changes.  And since this was a delete, there
5  were no changes made.
6      Q.  And then you go down to Account Type.  And what
7  does that code mean, the 48?
8      A.  That's the account type that was visible at the
9  time the ACDV itself was generated.
10     Q.  What is 48?
11     A.  Collection account.
12     Q.  And at the very bottom it's got, "Authorized
13 Signature: Nancy Cohen."  Is that who would have
14 completed this on behalf of Experian?
15          MR. HANTHORN:  All the way at the bottom.
16     A.  No, sir.  That would be somebody on behalf of
17 Equable in order to respond to the ACDV itself.
18     Q.  (BY MR. SELBY)  Okay.  So is there any
19 information on here that would be filled in by Experian?
20     A.  Only the account information that's populated
21 at the time the ACDV is sent.  So we do have all the ID
22 of the information, we have the account as reported by
23 Equable is all housed within this document, including
24 any kind of dispute reason codes and the relevant
25 information that was given at that time.

Page 140

1          (Exhibit Number 11 was marked)
2      Q.  Let me show you what's Deposition Exhibit 11,
3  which is also Experian Bates stamp 59, and it's page 7
4  of 18.  I'm going to ask you what that document is from.
5  What is that a page from?
6      A.  I would have to look at Experian's disclosure
7  log in order to tell you more information about
8  Exhibit 11.  What I can tell you on the face of it, it
9  appears to be page 7 of 18 where there's two trades
10 listed that was generated on February 28, 2011, with the
11 report number of -- report number of 3377-7674-78.  The
12 reason for this, I would have -- like I said, I would
13 have to look at the disclosure log to find out more
14 information.
15     Q.  Okay.  And not the reason for it, but just what
16 is that document?  In Experian's normal course of
17 business, I mean, what is that document?
18          MR. HANTHORN:  What would the 18-page
19 document be; is that --
20          MR. SELBY:  Right.  That was my question
21 earlier.
22          MR. HANTHORN:  Sorry.
23     A.  The 18-page document would be a consumer
24 disclosure that was generated on February 28th, 2011.
25 More information about how it was requested, things of

35 (Pages 137 to 140)

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 141

1   that nature, I would have to look at Experian's
2   disclosure log that would give me more information.
3       Q.  (BY MR. SELBY)  Not more information as to know
4   what the document is; just more information about the
5   document?
6       A.  And the reason for it being requested, sir.
7           MR. HANTHORN:  But the document is the
8   consumer disclosure form --
9           MR. SELBY:  Right.
10          MR. HANTHORN:  -- to Mr. Collins.
11          (Exhibit Number 12 was marked)
12      Q.  (BY MR. SELBY)  I'll ask you to identify what
13  Deposition Exhibit 12 is.
14      A.  This is the investigation results that was
15  received -- or that was initiated post-litigation at the
16  direction of counsel where we're showing Experian
17  received a response back from Equable and they requested
18  the account to be deleted.  That's on March 10th, 2011,
19  report number 3377-7674-78.
20      Q.  Do you know why that report doesn't have
21  anything on the second page?
22      A.  Yes, I do.
23      Q.  Why is that?
24      A.  Because the account was deleted.
25      Q.  Okay.  So if the account's deleted, it's not

Page 142

1   going to have anything on the second page, right?
2       A.  Yes.  That's correct.
3       Q.  Okay.  And do you know why this report is
4   different in format than Deposition Exhibit 6?  And,
5   specifically, the "How to read your results" where it's
6   got -- Deposition Exhibit 6 has four categories,
7   correct?
8       A.  Four categories as far as the results, yes.
9       Q.  Okay.  Deleted, Remains, Updated and Reviewed,
10  correct --
11      A.  Yes, sir.
12      Q.  -- is on Exhibit 6?
13          On Exhibit 12, it doesn't have "Reviewed;"
14  is that correct?
15          MR. SELBY:  What did you just point to?
16          MR. HANTHORN:  I pointed to "Investigated"
17  as the fourth one, assuming that was where you were
18  trying to --
19          MR. SELBY:  No.  I just wanted to know if
20  "Reviewed" is on there.
21      A.  No, I do not see "Reviewed."  And I -- this is
22  actually the first time that I saw that change.
23      Q.  (BY MR. SELBY)  Do you know -- was that a part
24  of a change in recognizing the glitch with this
25  Exhibit 6?

Page 143

1       A.  I do not know.
2       Q.  Okay.  Is that possible?
3       A.  I just don't have that kind of knowledge.  I
4   don't know.
5       Q.  Okay.  Do you know whether -- as we sit here
6   today, when Experian does reinvestigations, do they use
7   the format that's in Exhibit 6 or in Exhibit 12?
8       A.  On a system level, I can tell you what's
9   printed here.  Beyond that, I just don't have that kind
10  of knowledge, sir.
11      Q.  Okay.  And that's all I'm asking is what's
12  printed here.  I mean, is what they're using that's
13  printed here, Exhibit 12, is that the one used or is
14  Exhibit 6?
15      A.  My understanding is what's printed on
16  Exhibit 12 would be the most updated information.
17  Beyond that, what's used, I just don't know that system
18  part of it.
19      Q.  Do you know when it was changed from using
20  Exhibit 6 to using the format in Exhibit 12?
21      A.  No, sir.
22          MR. SELBY:  Greg, for purposes of
23  witnesses, is it -- would this witness --
24      Q.  (BY MR. SELBY)  Well, let me ask:  Are you
25  familiar with the e-OSCAR system?

Page 144

1       A.  Just generally.  I'm not a systems person.
2       Q.  Would the next person who's going to be
3   testifying, the systems person, be more familiar with
4   e-OSCAR than you are?
5           MR. HANTHORN:  Hold on one second.  Sorry.
6           Let me give you the short answer to that.
7   I don't see e-OSCAR in the categories, but to the extent
8   that it deals with questions on a system-wide basis --
9   and if I'm missing it, I apologize.  But to the extent
10  it involves things on a system-wide basis, not computer
11  programming, I'm confident the next witness is the
12  person to --
13          MR. PHILLIPS:  Okay.  Well, this is a
14  document y'all produced to us.
15          MR. HANTHORN:  I understand that.  And on
16  a -- and on a system -- yeah, out of -- yes.
17          (Discussion off the record)
18      Q.  (BY MR. SELBY)  Does Experian set limits on how
19  many disputes an agent has to complete in an hour?
20      A.  No.
21      Q.  Do they have any kind of time limit on that at
22  all?
23      A.  No.
24      Q.  So it would be fair to say, then, that agent
25  can take as much time as they need for purposes of a

36 (Pages 141 to 144)

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 145

1  reinvestigation?
2      A.  In order to get it right.
3      Q.  Okay.  And that agent wouldn't testify -- a
4  particular agent on a dispute -- I mean, Experian allows
5  the agents to do what they need to do to reinvestigate
6  the matter?
7      A.  Yes.
8      Q.  Okay.  And is it Experian's policy to allow an
9  agent to go to sources outside of somebody like Equable
10 on a trade line dispute, to go to the court or to
11 contact people?  Are the agents told that they can do
12 that?
13     A.  Depending on what Experian receives at that
14 moment, yes.  We do phone verifications.  Sometimes we
15 do call courts.  If it's a public record item itself, we
16 would send the request through our public record vendor
17 to get more information about information that's filed
18 at the court.  So there's an opportunity -- it really
19 depends.  Each one would be different.
20     Q.  So there's actually a public record vendor that
21 Experian has at their disposal to verify public record
22 information?
23     A.  When it's disputed by consumers, there's a
24 public record information section on the report.  And
25 when that information is disputed, we do have a public

Page 146

1  record vendor, yes.
2      Q.  Okay.  The public record vendor was not used in
3  Mr. Collins' case?
4      A.  There was not a public record item on his
5  report that he was disputing.  It was an actual trade
6  item account that was being disputed.
7      Q.  Okay.  So when you say "public record," you're
8  not -- Experian doesn't look at a court judgment as a
9  public record?
10        MR. HANTHORN:  I think what the witness
11 said was with respect to the public records section of
12 the report.
13     Q.  (BY MR. SELBY)  Okay.  So unless the trade item
14 itself is a public record, Experian doesn't use that
15 public record vendor -- the public record vendor
16 wouldn't be someone being used, for instance, in
17 Mr. Collins' case to contact the court?
18     A.  That's correct.
19        MR. HANTHORN:  And I know you didn't mean
20 to do this, but just because it's hypothetical, just
21 because we know it's on there, if he had disputed his
22 bankruptcy, which is public record information, that's a
23 situation where the public record vendor would have gone
24 back to confirm that the bankruptcy that shows up on his
25 report in the public record section was correct.

Page 147

1      Q.  (BY MR. SELBY)  Are you familiar with an e-mail
2  address coming out of Experian that would just be the
3  auto.notification@experian.com?
4      A.  My understanding would be when consumers
5  request the results to be sent to an e-mail address, the
6  e-mail address that's given at that time would be used
7  in order to send that kind of generated e-mail
8  notification.  When the results are ready to be viewed
9  online, I believe they would click on a link and it
10 would take you to Experian's secured Web site to see the
11 results of the reinvestigation.
12     Q.  Are you aware of any other instances where a
13 consumer would get that auto notification e-mail, other
14 than what you just described?
15     A.  Not to my knowledge.
16     Q.  Is it fair to say that Experian is contacted by
17 hundreds, if not thousands, of consumers on a weekly
18 basis disputing trade lines and information in their
19 credit report?
20     A.  I don't know the exact number, but there are
21 quite a few.
22     Q.  I mean, would it be in the thousands in a week?
23     A.  I just don't know the number to tell you for
24 sure.  But I guess it would be different from week to
25 week.  I'm not sure.

Page 148

1      Q.  How many agents does Experian have on staff to
2  handle disputes, reinvestigations?
3      A.  I believe, right around 400-ish, that type of
4  number.
5      Q.  And that's their sole responsibility; is that
6  correct?
7      A.  Yes.  These are agents that are trained in
8  order to handle both mail and phone disputes.
9      Q.  Are all 400 of those folks here in the Dallas
10 area?
11     A.  No.
12     Q.  Where are they all located?  Where are the
13 different --
14     A.  As far as location, we do have a National
15 Consumer Assistance Center here in Allen, Texas, as well
16 as a National Consumer Assistance Center in Chile --
17 Santiago, Chile.
18     Q.  Okay.  And the one that's operated in --
19 Santiago, you said?
20     A.  Yes.
21     Q.  Is that a company owned by Equable -- excuse
22 me -- I mean, by Experian?
23        MR. HANTHORN:  That's not what this
24 witness is designated on.  I will tell you that
25 functionally they're treated as Experian employees.

37 (Pages 145 to 148)

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 149

1  There may be some ownership issues having to do with
2  Chilean law about what the entity or the structure is,
3  but functionally in terms of how witnesses interact on a
4  day-to-day basis with folks, they're Experian employees.
5  That may not be the technical legal definition under
6  Chilean law.
7      Q.  (BY MR. SELBY)  Is there a way -- I mean, can
8  you tell by looking at, for instance, like, Mr. Collins'
9  report to tell where that particular agent is physically
10  located?  Can you look at -- let me back up.  Poorly
11  worded.
12          When you look at an agent's code, whatever
13  code that agent's given, can you tell by that agent code
14  whether they are located in Allen, Texas or whether
15  they're located in Santiago?
16      A.  We would have to look at -- look up the actual
17  agent code for the agent ID information.
18      Q.  Okay.  But you could tell by looking up the
19  code ID information?
20      A.  Yes, sir.
21          MR. HANTHORN:  Can you get what she's
22  saying?  She would figure out who the agent is and then
23  see where that agent physically is.
24          MR. SELBY:  Right.
25          MR. HANTHORN:  Okay.

Page 150

1          MR. SELBY:  Let's take a quick break.
2          MR. HANTHORN:  Okay.
3          (Recess from 1:33 to 1:43)
4      Q.  (BY MR. SELBY)  I've got Exhibits 5, 7 and 10
5  in front of you.  Is there an order in which these would
6  go as far as which -- from a chronology standpoint,
7  which comes first?
8      A.  Exhibit 5 is something within Experian's --
9  kept within Experian's system, printed only for this
10  litigation.
11      Q.  Okay.
12      A.  Exhibit 7 was something that is also kept
13  within Experian's system, printed just for this
14  litigation.  This happened -- Exhibit 7 happened prior
15  to Exhibit 10.  However, all of these documents are just
16  kept within Experian's system, so there's not a --
17      Q.  Okay.
18      A.  They were retrieved at the request of counsel.
19      Q.  I understand that.  Maybe a better way to ask
20  it is this:  Based on the information that's in --
21  that's entered into Exhibit 5, was that information
22  entered into Exhibit 5 prior to the information entered
23  into Exhibit 7?
24      A.  I believe we're talking on more of a system
25  level.  The information in Exhibit 5 is more of a tool

Page 151

1  that we can retrieve on the response side.  The system
2  is doing its thing and then it generates this kind of a
3  change; and then when we access the report, we can see
4  that.  What's happening in the background and what's
5  generating that is not -- is not going to be in this
6  kind of a format.  Exhibit 7 is printed in this
7  particular format so it's easy to view the information
8  on the response side.  So this is actually kept in a
9  string of information, printed only for this litigation.
10          MR. HANTHORN:  Are 5 and 7
11  contemporaneous, happening at the same time?
12          MR. SELBY:  Are you asking me?
13          MR. HANTHORN:  No.  I'm -- you had given
14  it as just an either/or.  And if I heard what the
15  witness was saying correctly about what's in background
16  and what's not -- it looks like 10 is later, so we got
17  it aside.  And the question is are 5 and 7, based on the
18  information in them, going on at, more or less, the same
19  time.
20      Q.  (BY MR. SELBY)  The information that's in
21  Exhibit 5 -- for instance, we had talked about maybe
22  there's a better way to ask this.  This type 48 in
23  Exhibit 5, when would that information, as it appears in
24  Exhibit 5, have been entered?
25      A.  It's going to be -- when the system is

Page 152

1  receiving the response itself --
2      Q.  Okay.
3      A.  -- it's making that kind of a change.  So we
4  see type 48 here and we see type 48 here.  Beyond that,
5  what's happened in the background, you know, when
6  information's populated and visible on this page as
7  opposed to in that long string of information, I just
8  don't have the system knowledge to tell you how that
9  would work.  I can tell you based off of these documents
10  and the reinvestigation process and what I'm able to
11  view.
12      Q.  Okay.  Then on Exhibit 10 -- earlier you said
13  that 48 is code for a collection account, correct?  Is
14  that what you testified to earlier about Exhibit 10?
15      A.  Account type 48?
16      Q.  Yes.
17      A.  Yes.
18      Q.  And that's the same with Exhibit 5 and 7,
19  correct, where 48 is?
20      A.  What we have in Exhibit 5 is the snapshot of
21  what the account looked like on 9/3/2010.  So up here in
22  the body of it, we have factoring company and on the
23  response side, on 9/9, we have type 48.  So that change
24  is all visible, even though it didn't all happen at the
25  same time.

38  (Pages 149 to 152)

**Maxene Weinberg Agency
(800) 640-1949**

Page 153

1    Q.  Okay.  But type 48 there is referring to a
2    collection?
3    A.  That's the type of account it was changed to.
4    That's the information --
5    Q.  Okay.  What's the difference between a
6    factoring company and a collection?
7    A.  I only have general knowledge of it.  My
8    understanding would be something -- that there would be
9    two completely different types of types -- sorry, types
10   of -- I don't want to say type -- account type.  I'm
11   sorry.  I just don't know if one receives the debt
12   collecting for another company or whatever.  My
13   understanding is just what we have here today as far as
14   the account type that's reported to Experian.
15   Q.  Okay.  And the account type meaning a
16   collection account; is that correct?  Is it a collection
17   account?  Was Equable -- is that a collection account?
18   A.  As far as Equable, they do tell us to change
19   their factoring company account type to type 48; and
20   that's something that they told Experian on 9/9/2010.
21   Q.  And 48 being a collection type?
22   A.  The type of account, collection.
23   Q.  Okay.  And that 48 also appears on Exhibit 7;
24   is that correct?
25   A.  Yes.  We have the On Profile information that

Page 154

1    was sent to Equable.  So we do see the OC, which is the
2    factoring company, and the subscriber response side of
3    48.  So similar to what we see in Exhibit 5, we do have
4    the same changes happening.  This is just a different
5    format.  It's taking Exhibit 5 information and then
6    formulating a viewable, printable Exhibit 7.
7    Q.  Okay.  And then on over to Exhibit 10, 48 still
8    shows a collection account as 48?
9    A.  Right.  So based off of the change that was
10   requested through the response side, we do have the
11   account type of 48 for Exhibit 10.
12   Q.  Okay.  And is the account type 48 correct for
13   purposes of this account?
14   A.  That would be up to Equable to report that
15   information to Experian.
16   Q.  Why would that be up to Equable?
17   A.  To give Experian the account type for the --
18   for the type of company that they are.  That's not
19   information that Experian creates.  It is reported by
20   the creditor or the data furnisher.
21   Q.  Okay.  But as you sit here today, I mean, do
22   you know, is that correct?  48 being a collection, I
23   mean, is that right?
24   A.  Each time that the company gives Experian --
25   information to Experian, we believe it to be correct.

Page 155

1    If they change it, then they need to -- need to tell
2    Experian the changes.
3    Q.  And you don't have any reason to believe that
4    the information they provided you, the 48, about it
5    being a collection account is incorrect?
6    A.  It would be whatever they have within the
7    records about that type of account.
8    Q.  But, I mean, it's not Experian's position that
9    what they told you is wrong is what I'm asking, 48?
10   A.  It would be -- whatever they're reporting, we
11   would believe the information to be accurate.
12   Q.  And does it make a difference to Experian?
13   A.  On the reinvestigation side, this is the
14   information that I have.  Beyond that, I just wouldn't
15   know.
16   Q.  But, I mean, does it make a difference to
17   Experian as to -- on the reinvestigation side, whether
18   or not it's a 48, whatever they're telling you what type
19   of account it is, does it make a difference?
20   A.  As far as the information itself, it makes a
21   difference as far as the account type.  There is
22   multiple types for mortgages.  There's multiple types
23   for other types of loans.  So the account type is
24   specific for that particular company.  So it is
25   important to have the information reported to Experian.

Page 156

1    Q.  And up here where it's got "Type" and
2    "Factoring Company" on Exhibit 5, is that what you're --
3    is that correct that Equable provided?
4    A.  That is the information that Equable provided
5    to Experian.
6    Q.  Okay.  And as far as you know, is that correct
7    or incorrect?
8    A.  Experian would believe the information to be
9    correct and would have no other reason to believe it
10   would be incorrect.  If something changes, then they
11   would need to report that information to Experian.
12       MR. SELBY:  Okay.  That's it.
13       MR. HANTHORN:  Give me one second just to
14   make sure I understand something; and I'll do it at the
15   table just by turning and talking very quickly, if you
16   don't mind.
17       MR. SELBY:  Sure.
18       (Sotto voce discussion off the record)
19       MR. HANTHORN:  One question just to
20   clarify.  And I'll do it on Exhibit 5.
21           EXAMINATION
22   BY MR. HANTHORN:
23   Q.  Mr. Selby pointed you to the factoring company
24   type FCO.  Is Exhibit 5 reflecting that Equable changed
25   the account type from factoring company to type 48?

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 157

1    A.  Yes.  That was a requested change on the ACDV
2  itself.
3         MR. HANTHORN:  Thank you.
4              RE-EXAMINATION
5  BY MR. SELBY:
6    Q.  And is -- we took a break.  I mean, is that
7  your answer after talking with your counsel?
8         MR. HANTHORN:  I'll go ahead and stipulate
9  that I asked her what the answer was and that we just
10  replayed it right in front of you.  But, yes, it is, in
11  fact, her answer after you saw us take a break and I
12  told you we were doing it at the table.
13    Q.  (BY MR. SELBY)  Okay.  We went through this
14  earlier and I thought this was different now than what
15  you said.
16         MR. HANTHORN:  That's why I wanted to
17  clarify.
18         MR. SELBY:  Clarify that she was wrong
19  before?
20         MR. HANTHORN:  No.  Clarify that you
21  appear to be misunderstanding.
22         MR. SELBY:  I'm just asking questions.
23         MR. HANTHORN:  Okay.
24    Q.  (BY MR. SELBY)  Explain to me what is wrong in
25  looking at Exhibit 5.

Page 158

1    A.  I'm not sure what you mean by "what is wrong,"
2  sir.
3    Q.  Okay.  The factoring company, this information
4  here provided by Equable, is that correct?
5    A.  Let me make sure I understand you correctly.
6  The information that was previously reported by Equable,
7  they told us the account type was factoring company.
8    Q.  Okay.  Let me stop you there.  I'm sorry.  When
9  you say that was previously provided by Equable, where
10  are you getting that it was previously provided?
11    A.  This is a snapshot of what the account looked
12  like --
13    Q.  Right.
14    A.  -- on 9/3/2010.  So based on all this
15  information, this is what the account looked like as
16  reported by Equable.
17    Q.  Okay.  So on -- if you look at Exhibit 5, on
18  9/3/2010 it says "Factoring Company," correct?
19    A.  Yes, sir.
20    Q.  Okay.  And then you come down here and this
21  is -- the next snapshot is for 9/9/2010, right?
22    A.  I'm not quite sure what you mean, "the next
23  snapshot."
24    Q.  Okay.  Is the factoring company information
25  based on what was a snapshot as of 9/3?

Page 159

1    A.  That's correct.
2    Q.  Okay.  And is the information -- where it says
3  "Response Date, 9/9/2010," below that, is all that
4  information a snapshot for September 9th, 2010?
5    A.  That's going to be everything that they
6  requested a change to, based on the ACDV response
7  itself.
8    Q.  Okay.  And the change here you're saying is
9  that the factoring company -- the type change from
10  factoring company to the change to type 48, which is a
11  collection company, right?
12    A.  Yes.  That's correct.  They're changing the
13  account type from factoring company to 48, which is a
14  collection account.
15    Q.  Okay.  And you're saying that that is --
16  because of that change between 9/3/2010 and 9/6/2010 --
17         MR. HANTHORN:  9/9.  But go ahead.
18    Q.  (BY MR. SELBY)  -- excuse me, 9/9/2010, that
19  change there between calling it a factoring company and
20  calling it a collection company, that was the reason
21  that the trade line information was left off on that
22  report to Mr. Collins?
23    A.  As far as the information being account type,
24  it's a very important key change which would trigger the
25  glitch where it did not populate this actual change here

Page 160

1  on the reinvestigation results.  So based off of the
2  fact that it was a factoring company and going to a type
3  48 is not something that we would normally see in an
4  ACDV response.
5    Q.  But that you're saying -- your testimony is
6  that that's what triggers the fact that the
7  reinvestigation results report doesn't have the trade
8  line information?
9    A.  Let me make sure I understand you correctly.
10  As far as the system glitch that did not populate, the
11  actual change itself, yes, it was because of that type
12  change.
13    Q.  Let me make sure I understood what you said
14  earlier.  I mean, you don't know -- you haven't
15  investigated or determined whether or not this has
16  happened in other instances where the trade line was not
17  populated as a result of this glitch?
18    A.  No.  I've never seen it before.
19    Q.  Okay.  Have you looked into it, though?  I'm
20  not asking whether you have actually seen it before.
21  But have you looked into it, said, Hey, I'm a compliance
22  officer.  I've learned about this glitch.  I need to
23  look into to see whether this has happened to other
24  people?  Have you done that?
25    A.  Anything that I've done would be at direction

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 161

1  of counsel.  Beyond that, no.
2      Q.  Okay.  You haven't done that at direction of
3  counsel, though?
4          MR. HANTHORN:  She would not be the person
5  who would know how to investigate that.  So I would not
6  have directed her to investigate that.  She has -- as I
7  stipulated earlier, she is aware that we have looked
8  into it.
9      Q.  (BY MR. SELBY)  What's the OC by Factoring
10  Company mean on Exhibit 5?
11     A.  All of the account types typically would have
12  either a number associated or some letters.  And that's
13  just the letters that are associated with that account
14  type.
15     Q.  And those letters, the OC, also appear on
16  Exhibit 7, correct?  It's under Collection Account.
17     A.  I just can't see the exhibit number.  I'm
18  sorry.
19         MR. HANTHORN:  This is Exhibit 7.
20     A.  Yes, it is, sir.
21     Q.  (BY MR. SELBY)  Okay.  And on Exhibit 7, the OC
22  also appears under the column Collection Account, On
23  Profile?
24         MR. HANTHORN:  Well, under the column On
25  Profile, yeah.

Page 162

1      Q.  (BY MR. SELBY)  Under the column On Profile,
2  correct?
3      A.  Yes, sir.
4      Q.  Okay.  And then the 48 also appears on
5  Exhibit 7 as well; is that correct?
6          MR. HANTHORN:  Under the column Subscriber
7  Response.
8      A.  Yes.  That was a requested change.
9      Q.  (BY MR. SELBY)  Again, that's under Subscriber
10  Response, right?
11     A.  Yes, sir.
12     Q.  And the one under On Profile where it's got the
13  OC, that's the same information that appears as of
14  9/3/2010 if you look at a snapshot, correct, the OC
15  here?
16     A.  Exhibit 5 and Exhibit 7 would be the same kind
17  of information.  It's just capturing it in a log format
18  and then capturing it within Experian's records.  Each
19  of these is something that's printed at the request of
20  counsel for this -- for discovery.
21         MR. SELBY:  I'm done.
22         MR. HANTHORN:  We'll reserve.
23         (Proceedings concluded at 2:01 p.m.)
24
25

Page 163

1      I, TERESA IWANSKI, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5
6          _____
          TERESA IWANSKI
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 164

1  STATE OF TEXAS   )
2  COUNTY OF DALLAS )
3
4          REPORTER'S CERTIFICATION
5  DEPOSITION OF EXPERIAN INFORMATION SOLUTIONS, INC.
6  BY AND THROUGH ITS DESIGNATED REPRESENTATIVE
7          TERESA IWANSKI
8          TAKEN JUNE 21, 2012
9
10     I, Christi Sanford, Certified Shorthand
11  Reporter in and for the State of Texas, hereby certify
12  to the following:
13         That the witness, TERESA IWANSKI, was duly
14  sworn by the officer and that the transcript of the oral
15  deposition is a true record of the testimony given by
16  the witness;
17         That the deposition transcript was submitted on
18  _____ to the witness or to the
19  attorney for the witness for examination, signature and
20  return to the officer by _____;
21         I further certify that pursuant to FRCP
22  No. 30(f)(i), the signature of the deponent was
23  requested by the deponent or a party before the
24  completion of the deposition and that the signature is
25  to be before any notary public and returned within 30

**Maxene Weinberg Agency**
**(800) 640-1949**

Page 165

1    days from date of receipt of the transcript.  If
2    returned, the attached Changes and Signature Page
3    contains any changes and the reasons therefor;
4          I further certify that I am neither counsel
5    for, related to, nor employed by any of the parties in
6    the action in which this proceeding was taken, and
7    further that I am not financially or otherwise
8    interested in the outcome of the action.
9          Certified by me this 4th day of July, 2012.
10
11
12
13                 Christi Sanford, Texas CSR, CRR, RPR
14                 Texas Certification No. 6720
                   Certificate Expires: 12/31/13
15
                   Maxene Weinberg Agency
16                 27281 Las Ramblas, Suite 160
                   Mission Viejo, California 92691
17                 (800) 640-1949
                   (949) 582-8569 Fax
18                 www.mwadepos.net
19
20
21

22
23

24
25

**Maxene Weinberg Agency
(800) 640-1949**